**FILED**
2006 Jun-16  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| | § | |
| AVOCENT HUNTSVILLE CORP., | § | |
| an Alabama corporation, | § | Civil Action No. |
| *Plaintiff,* | § | CV-03-S-2875-NE |
| v. | § | |
| | § | **JURY TRIAL** |
| CLEARCUBE TECHNOLOGY, INC., | § | |
| a Texas corporation, | § | |
| *Defendant.* | § | |
| | § | |

## MOTION IN LIMINE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| AVOCENT HUNTSVILLE CORP., | § § § | |
| an Alabama corporation, | § | Civil Action No. |
| *Plaintiff,* | § | CV-03-S-2875-NE |
| v. | § § | |
| | § | **JURY TRIAL** |
| CLEARCUBE TECHNOLOGY, INC., | § | |
| a Texas corporation, | § | |
| *Defendant.* | § § | |

## <u>MOTION IN LIMINE</u>

ClearCube Technology, Inc. ("ClearCube"), defendant in the above-entitled and numbered civil action, files this Motion in Limine. In support, the defendant will show the following: ClearCube contends that introduction of evidence or arguments as to any of the following subject areas should be barred for at least the reasons that it would be irrelevant under Fed. R. Evid. 402 and/or improper under Fed. R. Evid. 403 as unfairly prejudicial, confusing or misleading to the jury.

Counsel for the plaintiffs and each of its witnesses must be instructed not to mention, discuss, or allude to the following during voir dire, opening statement, direct or cross-examination, or closing argument until he or she approaches the bench so that the Court may determine admissibility outside the presence of the jury. This procedure is necessary so that inadmissible evidence and improper

statements under Fed. R. Evid. 402, 403, and 404 are not brought to the jury's attention. If such matters are brought to the jury's attention, a curative instruction will not be sufficient to prevent harm. Instead, the defendant's substantial rights will be prejudiced.

1.      Any evidence and testimony by William Kerr which is the subject matter of a pending Daubert motion by ClearCube. *See,* Defendant ClearCube Technology Inc.'s Motion to Exclude Testimony of William O. Kerr filed under separate cover (Paper no. 209).

2.      Any reference to ClearCube being allegedly liable for infringement under the Doctrine of Equivalents pertaining to the "adapter" of claim 1 of the '919 patent, as no evidence for such an allegation has been provided. *See* Memorandum in Support of Motion in Limine to Exclude Arguments and Testimony Pertaining to the Doctrine of Equivalents attached hereto as Exhibit A.

3.      Any reference or evidence that a double patenting rejection was issued in the '442 application, any evidence or reference that the '404 patent was considered by the patent office as prior art to the patents-in-suit, any evidence or reference that the '404 patent was known or understood by the patent office to constitute prior art to the patents in suit. *See* Memorandum in Support of ClearCube's Motion in Limine Regarding Patent Office Consideration of the '404 Patent as Prior Art attached hereto as Exhibit B.

4.     Any evidence of alleged lost profits proffered by Avocent.  *See,* Memorandum in Support of Motion in Limine to Exclude Evidence on Lost Profits, Irreparable Harm and Company Size/Location attached hereto as Exhibit C.

5.     Any evidence proffered by Avocent attempting to establish entitlement to injunctive relief including any evidence of alleged irreparable harm. Other than a general pleading of such alleged harm, there is no evidence to support such pleadings.  See *Ebay v. MercExchange L.L.C.*, 126 U.S. 1837, 1841 (2006), "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *See, e.g., Romero-Barcelo, 456 U.S., at 320, 102 S. Ct. 1798, 72 L. Ed. 2d 91.*   These familiar principles apply with equal force to disputes arising under the Patent Act. As this Court has long recognized, "a major departure from the long tradition of equity practice should not be lightly implied."  In response to ClearCube's Interrogatories inquiring as to damages Avocent merely alleged monetary damages.[1]  *See,* Avocent's Second Supplemental Response to Interrogatory No. 10 attached hereto as Exhibit D.  Avocent discovery responses fail to support any claim of irreparable harm. *See also,* Memorandum in Support of Motion in Limine

---

[1]     Moreover, Avocent merely seeks a reasonable royalty as its damages.  Avocent has failed to make any showing that it is entitled to lost profits or that it is losing sales to ClearCube.

to Exclude Evidence on Lost Profits, Irreparable Harm and Company Size/Location attached hereto as Exhibit C.

6.     Any evidence of secondary considerations of non-obviousness. Avocent has alleged in mere conclusory form that secondary considerations of non-obviousness are "commercial success of its analog video extension technology inventions" and "adoption of that technology as the industry standard."  Avocent's conclusory allegations were made in response to ClearCube's interrogatory No. 18 attached hereto as Exhibit E.  Other than these mere conclusory statements there has been no evidence of any secondary considerations.  For example, Avocent has failed to show any commercial success of its own products let alone tied the alleged commercial success of its products to the *claimed invention*.  Further Avocent has failed to show any "industry standard" that has developed around the patented technology.  To proffer evidence of secondary considerations, Avocent must make the necessary showing that the alleged secondary considerations of non-obviousness are due to the claimed inventions.  Avocent has wholly failed to offer any evidence secondary considerations.  (See *Graham v. John Deere Co.,* 383 U.S. 1 (1966)).  Accordingly, Avocent should be precluded from offering any evidence on any secondary considerations of non-obviousness.

7.     Any evidence of Avocent's geographic location, location of its headquarters, its revenue, its size or the number of its employees.  *See*

Memorandum in Support of Motion in Limine to Exclude Evidence on Lost Profits, Irreparable Harm and Company Size/Location attached hereto as Exhibit C.

8.      Any evidence with respect to Claims 6 and 17 of the '919 patent. ClearCube is willing to stipulate that if claim 1 of the '919 patent is found valid, enforceable and infringed, then claim 6 (dependent from claim 1) is similarly valid, enforceable and infringed.[2]  Similarly ClearCube is willing to stipulate that if claim 16 is found to be valid and enforceable, then claim 17 (dependent from claim 16) is similarly valid and enforceable.[3]  Accordingly Avocent should be precluded from offering any evidence on these claims.

9.      Other than the Court's instruction to the jury that it has found ClearCube infringes claims 16, 17 and 18 of the '919 patent, no further reference to such finding or testimony, suggestion or characterization by Avocent to alleged infringement of those claims by ClearCube.

10.      Any evidence proffered by Avocent relating to prior patent litigation by Avocent (e.g. Raritan litigation).  When evidence of prior litigation is proffered, such evidence "must pass muster, like any other evidence, as relevant and probative of an issue in the second case."  See *Mendenhall v. Cedarapids, Inc.*, 5

---

[2]    This stipulation is offered provided that Avocent similarly stipulates that if claim 1 is found invalid, unenforceable and/or not infringed, then claim 6 is similarly invalid, unenforceable and/or not infringed.
[3]    This stipulation is offered provided that Avocent similarly stipulates that if claim 16 is found invalid and/or unenforceable, then claim 17 is similarly invalid and/or unenforceable.

F.3d 1557, 1573 (Fed. Cir. 1993) (in which a judge's opinion of a patent's validity in one trial involving a first party was excluded from a second trial involving a second party). Any verdict on the patents litigated in prior proceeding does not affect their status as prior art to the current patents in suit and does not implicate the issues in this civil action. The defendant herein was not a party to those civil actions, and, therefore, did not have the opportunity to participate in the trial of those civil actions.

11.    Any evidence proffered by Avocent relating to other litigation between Avocent and any party, as such litigation includes parties not involved in the present case, and is not relevant to the claims in this case.

12.    Any reference to discovery disputes and this Court's ruling on such disputes. Those issues are not relevant to any issue to be determined by the jury in this case.

13.    Any reference to any correspondence, discussions, statements, disagreements, or negotiations between counsels in this case.  Those issues are not relevant to any issue to be determined by the jury in this case.

14.    Any reference that the defendant, its witnesses, or its counsel refused or allegedly refused or failed to retain, produce, or caused to be produced any document, thing, report, statement, material or information.  Those issues are not relevant to any issue to be determined by the jury in this case.

15.    Any mention, reference or question regarding the defendant's claim of any privilege listed in the Rules of Evidence, whether in the present proceeding or upon a prior occasion, for the reason that such is not a proper subject of comment by judge or counsel, and no inference may be drawn therefrom.  Those issues are not relevant to any issue to be determined by the jury in this case.

16.    Any reference whatsoever to any motions or other requests for relief filed by the defendant that was not favorably acted upon by the Court.  Those issues are not relevant to any issue to be determined by the jury in this case.

17.    Any evidence and exhibit relating to other activities, wrongs or acts of third-parties, which are not pleaded in this action.  Those issues are not relevant to any issue to be determined by the jury in this case.

WHEREFORE, PREMISES CONSIDERED, the defendant prays this motion will be granted requiring plaintiff to approach the bench before mentioning, discussing, or alluding to the matters set forth above so that the Court can take up these issues outside the hearing of the jury.

Respectfully submitted,

J. David Cabello
Russell T. Wong
Wong, Cabello, Lutsch,
    Rutherford & Brucculeri, L.L.P.
20333 State Hwy. 249, Suite 600
Houston, TX 77070
Telephone:    (832) 446-2400
Facsimile:    (832) 446-2424
**ATTORNEYS FOR DEFENDANT
CLEARCUBE TECHNOLOGY, INC.**

**OF COUNSEL**:
Harlan I. Prater, IV
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0720
Fax: (205) 581-0799

Joseph M. Cloud
Joseph M. Cloud, P.C.
521 Madison Street
Suite 35801
Huntsville, AL 35801
Tel: (256) 534-0545
Fax: (256) 534-8475

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing Motion in Limine has been served on the following counsel of record indicated below via facsimile, and/or prepaid first class mail, and/or electronic mail and/or in accordance with the Electronic Court Filing system guidelines on this the _____ day of June, 2006:

James D. Berquist, Esq.
Michael R. Casey, Esq.
J. Scott Davidson, Esq.
Peter W. Gowdey, Esq.
Donald L. Jackson, Esq.
Davidson Berquist Jackson
& Gowdy, LLP
4300 Wilson Blvd., 7th Floor
Arlington, Virginia 22203

J. Jeffery Rich., Esq.
Sirote & Permutt, P.C.
305 Church Street, Suite 800
P. O. Box 18248
Huntsville, Alabama 35804

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| AVOCENT HUNTSVILLE CORP., an Alabama corporation, *Plaintiff,* v. CLEARCUBE TECHNOLOGY, INC., a Texas corporation, *Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>CV-03-S-2875-NE<br><br>**JURY TRIAL** |

## PROPOSED ORDER IN LIMINE

This Court has considered ClearCube Technology, Inc.'s ("ClearCube") Motion in Limine and supporting memoranda and finds that the relief sought by ClearCube should be granted.

Accordingly it is ordered that counsel for Avocent shall not to mention, discuss, or allude to the following during voir dire, opening statement, direct or cross-examination, or closing argument until he or she approaches the bench so that the Court may determine admissibility outside the presence of the jury.

1.   Any evidence or testimony by William Kerr.

2.   Any reference to ClearCube being allegedly liable for infringement under the Doctrine of Equivalents with respect to the adapter of Claim 1 of the '919 patent.

3.      Any reference or evidence that a double patenting rejection was issued in the '442 application, any evidence or reference that the '404 patent was considered by the patent office as prior art to the patents-in-suit, any evidence or reference that the '404 patent was known or understood by the patent office to constitute prior art to the patents in suit.

4.      Any evidence of alleged lost profits proffered by Avocent.

5.      Any evidence by Avocent attempting to establish entitlement to injunctive relief including any evidence of alleged irreparable harm.

6.      Any evidence of secondary considerations of non-obviousness.

7.      Any evidence of Avocent's geographic location, location of its headquarters, its revenue, its size or the number of its employees.

8.      Any evidence with respect to Claims 6 and 17 of the '919 patent.

9.      Other than the Court's instruction to the jury that it has found ClearCube infringes claims 16, 17 and 18 of the '919 patent, no further reference to such finding or testimony, suggestion or characterization by Avocent to infringement of those claims by ClearCube.

10.      Any evidence proffered by Avocent relating to prior patent litigation by Avocent (e.g. Raritan litigation).

11.      Any evidence by Avocent relating to other litigation between Avocent and any party.

12.    Any reference to discovery disputes and this Court's ruling on such disputes.

13.    Any reference to any correspondence, discussions, statements, disagreements, or negotiations between counsels in this case.

14.    Any reference that the defendant, its witnesses, or its counsel refused or allegedly refused or failed to retain, produce, or caused to be produced any document, thing, report, statement, material or information.

15.    Any mention, reference or question regarding the defendant's claim of any privilege listed in the Rules of Evidence, whether in the present proceeding or upon a prior occasion.

16.    Any reference whatsoever to any motions or other requests for relief filed by the defendant that was not favorably acted upon by the Court.

17.    Any evidence and exhibit relating to other activities, wrongs or acts of third-parties, which are not pleaded in this action.

Avocent's counsel is hereby to inform its witnesses of this order barring Avocent from introducing any evidence with respect to the following enumerated matters unless its counsel first asks to approach the bench and seeks the Court's permission to offer evidence on these matters.

Done this ___ day of _____, 2006

_____
U. S. District Judge

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| AVOCENT HUNTSVILLE CORP., | § | |
| | § | |
| Plaintiff | § | CIVIL ACTION NO. |
| | § | |
| v. | § | CV-03-S-2875-NE |
| | § | |
| ClearCube TECHNOLOGY, INC., | § | JURY TRIAL DEMANDED |
| | § | |
| Defendant | § | |

## CLEARCUBE'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE ARGUMENTS AND TESTIMONY PERTAINING TO THE DOCTRINE OF EQUIVALENTS REGARDING ADAPTER

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **AVOCENT HUNTSVILLE CORP.,** | § | |
| | § | |
| **Plaintiff** | § | **CIVIL ACTION NO.** |
| | § | |
| **v.** | § | **CV-03-S-2875-NE** |
| | § | |
| **ClearCube TECHNOLOGY, INC.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant** | § | |

## CLEARCUBE'S MOTION IN LIMINE PRECLUDE ARGUMENTS AND TESTIMONY PERTAINING TO THE DOCTRINE OF EQUIVALENTS REGARDING ADAPTER

ClearCube Technology, Inc. ("ClearCube") seeks to preclude any arguments and testimony regarding the doctrine of equivalents regarding the adapter of claim 1 of the '919 Patent that Avocent Huntsville Corporation ("Avocent") may present at trial.

ClearCube Interrogatory No. 1 sought this information specifically:

**INTERROGATORY NO. 1:**

State all facts that support AVOCENT'S claims that

CLEARCUBE INFRINGES the PATENTS IN SUIT, including

without limitation, an identification of each patent claim allegedly

infringed, and for each such patent claim: the device accused of

infringement, the type of INFRINGEMENT (i.e. direct infringement,

literal infringement, infringement under the doctrine of equivalents,

1

contributory infringement, and/or infringement by inducement), and all factual bases of that claim of INFRINGEMENT.

Avocent provided the following response:

**AVOCENT'S RESPONSE:**

Avocent contends that ClearCube *literally infringes* claims 1, 6, 16-18 of the '919 patent and claim 1 of the '997 patent. [emphasis added]

. . . .

Given the *literal correspondence* of each of these claim limitation with features found in the accused products, Avocent does not now assert infringement under the doctrine of equivalents but reserves the right to do so should the need arise.

Avocent has disclosed no other evidence regarding the doctrine of equivalents relating to the adapter of claim 1 of the '919 Patent. Thus, Avocent should be precluded from introducing any arguments or testimony concerning the doctrine of equivalents on that element.

2

C:\Documents and Settings\JCranford\Desktop\CC's motion in limine to preclude arguments and testimony - doctrine of equivalents (v2).doc

I.    **ARGUMENT**

    A.    **Infringement under the Doctrine of Equivalents Requires Particularized, Limitation-by-Limitation Testimony.**

Infringement under the doctrine of equivalents requires the presence of every claim element or its equivalent (*i.e.,* some claim elements can be met literally, while others can be met by their equivalents). *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40 (1997). The determination of equivalents should be applied as an objective inquiry on an element-by-element basis to determine whether the accused device differs only insubstantially from the claimed limitation. *Id.* at 40. Courts have traditionally analyzed doctrine of equivalents issues using a three-part test articulated in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608-609 (1950). Under this test, infringement is found where the accused product or process performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claims. *Warner-Jenkinson*, 520 U.S. at 39-40; *accord Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 813 (Fed. Cir. 2002) (recognizing that the three-part *Graver Tank* test may be used to determine whether accused subject matter differs from a claimed limitation only insubstantially).[1]

---

[1]    The Supreme Court has explained that the particular linguistic framework used to describe the test for doctrine of equivalents is less important than whether the test is probative of the essential inquire: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? *Warner-Jenkinson*, 520 U.S. at 39-40. Regardless of whether the "insubstantial differences" test or the three-part "function-way-result" test should be employed, Avocent offers no evidence to support a finding of doctrine of equivalents using either methodology.

The evidentiary requirements necessary to prove infringement under the doctrine of equivalents include "the need to prove equivalency on a limitation-by-limitation basis," *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed. Cir. 1998) (citing *Warner-Jenkinson*, 520 U.S. at 29); *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 (Fed. Cir. 1996).  In addition, equivalency must be proven with "particularized testimony and linking argument" as to the "insubstantiality of the differences" between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. *Texas Instruments*, 90 F.3d at 1567.  "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.*

The purpose of "these evidentiary requirements [is to] assure that the fact-finder does not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Texas Instruments*, 90 F.3d at 1567 (internal quotations omitted).  Therefore, in order to prevent the doctrine from expanding a patent's protection beyond the proper scope of its claims, the Federal Circuit has warned that the application of the doctrine of equivalents

should be "the exception … [and] not the rule" in patent infringement actions.

*London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991).

A plaintiff asserting infringement under the doctrine of equivalents must

therefore "present *evidence* and *argument* concerning the doctrine and *each* of its

*elements*....  The evidence and argument on the doctrine of equivalents cannot

merely be subsumed in plaintiff's case of literal infringement....  Accordingly, the

fact there was evidence and argument on literal infringement, that may also bear on

equivalence," is insufficient to demonstrate infringement under the doctrine of

equivalents.  *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.,* 873 F.2d 1422,

1425 (Fed. Cir. 1989) (citations omitted, emphasis in original).

**B.    Avocent Should be Precluded From Offering Evidence or
        Arguments at Trial Pertaining to Infringement Under the
        Doctrine of Equivalents.**

Although the Federal Circuit "does not go so far as to require a recitation of

the magic words 'function,' 'way,' and 'result,' … it at least requires the *evidence*

to establish *what* the function, way, and result of *both* the claimed device and the

accused device are, and *why* those functions, ways and results are substantially the

same." *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 n.5 (Fed. Cir.

1991) (emphasis in original).

Here, there is no "evidence" that Avocent has regarding the doctrine of

equivalents and in fact the discovery propounded to elicit that information is

wholly unresponsive.[2]  There is no evidence as to "why those functions, ways and results are substantially the same" as the disputed elements of the asserted claims regarding the adapter of claim 1.  *See, e.g., Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed. Cir. 1985) ("giving no weight to the series of conclusory statements offered by [plaintiffs] expert witness").  Even the Federal Circuit's magic words "function," "way," and "result" are missing.

## II.   CONCLUSION

For the reasons set forth above, Avocent should be precluded from offering any testimony, opinions or other evidence at trial regarding alleged infringement by ClearCube under the doctrine of equivalents regarding the adapter of claim 1 of the '919 Patent.

Dated: 6 / 16 / 06

Respectfully submitted,

J. David Cabello
Russell T. Wong
**Wong, Cabello, Lutsch,**
   **Rutherford & Brucculeri, L.L.P.**
20333 State Hwy. 249, Suite 600
Houston, TX 77070
Telephone:   (832) 446-2400
Facsimile:   (832) 446-2424
**ATTORNEYS FOR
DEFENDANT
CLEARCUBE TECHNOLOGY, INC.**

---

[2] Other than legal-speaks reserving for itself some escape mechanism, there is no support whatsoever for the introduction of evidence relating to infringement under the doctrine of equivalents.

C:\Documents and Settings\JCranford\Desktop\CC's motion in limine to preclude arguments and testimony - doctrine of equivalents (v2).doc

**OF COUNSEL:**

Harlan I. Prater, IV
**Lightfoot, Franklin & White, L.L.C.**
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0720
Fax: (205) 581-0799

Joseph M. Cloud
**Joseph M. Cloud, P.C.**
521 Madison Street
Suite 35801
Huntsville, AL 35801
Tel: (256) 534-0545
Fax: (256) 534-8475

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2006, I electronically filed the foregoing **CLEARCUBE'S MOTION IN LIMINE TO PRECLUDE ARGUMENTS AND TESTIMONY PERTAINING TO THE DOCTRINE OF EQUIVALENTS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J. Jeffery Rich., Esq.
Sirote & Permutt, P.C.
305 Church Street, Suite 800
P. O. Box 18248
Huntsville, Alabama 35804

James D. Berquist, Esq.
Donald L. Jackson, Esq.
Peter W. Gowdey, Esq.
Davidson Berquist Klima & Jackson LLP
4501 N. Fairfax Drive, Suite 920 Arlington,
Virginia 22203

I further certify that I have served the foregoing on the following via first-class mail, postage prepaid:

J. Scott Davidson, Esq.
**Davidson Berquist Klima & Jackson LLP**
4501 N. Fairfax Drive, Suite 920
Arlington, Virginia 22203

Respectfully submitted,

Stacy L. Alston

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

AVOCENT HUNTSVILLE CORP.,

an Alabama corporation,

Plaintiff,

v.

CLEARCUBE TECHNOLOGY, INC.,

a Texas corporation,

Defendant.

Civil Action No.  5:03-CV-02875-CLS

JURY TRIAL

## MEMORANDUM IN SUPPORT OF CLEARCUBE'S MOTION IN LIMINE REGARDING PATENT OFFICE CONSIDERATION OF THE '404 PATENT AS "PRIOR ART"

J. David Cabello
Russell T. Wong
Wong, Cabello, Lutsch, Rutherford &
Brucculeri, L.L.P.
20333 State Hwy. 249, Suite 600
Houston, TX 77070
Telephone:    (832) 446-2400
Facsimile:    (832) 446-2424
**ATTORNEYS FOR DEFENDANT
CLEARCUBE TECHNOLOGY CORPORATION**

**OF COUNSEL:**
Harlan I. Prater, IV
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0720
Fax: (205) 581-0799
Joseph M. Cloud

Joseph M. Cloud, P.C.
521 Madison Street
Suite 35801
Huntsville, AL 35801
Tel: (256) 534-0545
Fax: (256) 534-8475

As explained more fully below, this motion in limine generally seeks to preclude Avocent *inter alia* from stating or inferring during trial that the '404 patent had been considered by the patent Examiner as "prior art." Specific prohibitions prayed for in this motion are set forth in the numbered paragraphs below.

One of the issues in this lawsuit concerns the validity (i.e., obviousness) and enforceablility of the patents-in-suit in light of an even earlier patent in Avocent's patent family—USP 5,276,404 (the '404 patent)—and summary judgment briefing is pending concerning both of these issues.

At one point in such briefing, Avocent contended the '404 patent had been considered by the patent office as "prior art" in its examination of the patents-in-suit. See Avocent Memo. in Support of Mot. for Part. S.J. re Invalidity, at 9 (filed April 19, 2006) ("[T]he Patent Office has said that [the patents-in-suit] are patentable despite their treatment of the '404 patent as prior art."). Despite this contention, Avocent also admits that the '404 patent was actually used to reject claims in the '442 application—a predecessor application to the applications that issued as the patents-in-suit. *See id.* Although Avocent glossed over the point, this basis for

rejection was not based on the '404 patent as prior art, but on a different basis, called "obviousness-type "double patenting.""[1]

Avocent's argument is basically to the effect that the '404 patent had been considered by the Examiner as concerns the patents-in-suit, and therefore that the Examiner (1) knew about the '404 patent as prior art (hence attempting to moot concerns regarding inequitable conduct), and (2) understood and reviewed the '404 patent as prior art (hence attempting to moot concerns regarding validity/obviousness under 35 U.S.C. § 103 and independent review thereof in this proceeding).

However, this argument is not correct, and has great potential to mislead and confuse the jury.

First, and perhaps most relevant, the '404 patent was not considered in any regard during the prosecution of the applications which issued as the patents-in-suit. Instead, the double patenting rejection occurred in a *different* application—the '442 application—the predecessor application to the patents-in-suit, which claimed subject matter that never issued. The '404 patent was not considered as prior art during the prosecution of the applications which matured into the '997 and '919 patents, a fact which can be quickly verified by noting that the '404 patent does not

---

[1]    See file history for U.S. Application Ser. 08/177,442 (office action dated Nov. 20, 1995, at 5) ("Claims 2 and 9-14 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-6 of 5,276,404 [the '404 patent] in view of [other prior art not relevant here.").

appear in the "References Cited" section on the front face of the '997 and '919 patents, as all considered references are.

Second, even were it proper to conclude that that issues considered in an earlier application (i.e., the '442 application) could be deemed as expressly considered in the later applications that issued as the patents-in-suit, the fact remains that a double patenting rejection in no way reflects an examination of the '404 patent as "prior art," the invalidity issue to be tried by ClearCube.

The doctrine of "obviousness type double patenting"[2] sounds confusingly like the principle of prior art "obviousness" under 35 U.S.C. § 103—the basis on which ClearCube seeks to prove the patents-in-suit invalid.   But the two are materially different.  Obviousness-type double patenting involves an impermissible attempt to claim essentially the same inventions twice.  *See Gerber Garment Technology, Inc. v. Lectra Systems, Inc.*, 916 F.2d 683, 686 (Fed. Cir. 1990).   Therefore, double patenting required, during the '442 application, the Examiner's comparison of the claims as issued in the '404 patent to the claims as pending in the '442 application. See Geneva Pharmaceuticals, Inc. v. GlaxoSmithKile PLC, 349 F3d. 1373, 1377 n.1 (Fed. Cir. 2003).   By contrast, obviousness compares the claims at issue to the "written description" or "disclosure" portion (i.e., non-claim portions) of a prior art

---

[2]     It is worth noting that the patent law also provides for a "***statutory***-type double patenting' rejection, but that is not relevant here.  Obviousness-type double patenting is sometimes referred to in the case law as "nonstatutory-type double patenting."

patent. *See In re Daniel*, 925 F.2d 1450, 1453 (Fed. Cir. 1991) (explaining the difference between obviousness-type double patenting and obviousness).[3]

Because "obviousness type double patenting" and "obviousness in light of prior art" comprise distinct bases for rejection of a patent claim each requiring consideration of different portions of a prior patent (i.e., the prior claims vs. the prior written description), it is not appropriate to conclude that consideration of the patent for double patenting amounted to a consideration of the patent as prior art.

The patent office's Manual of Patent Examining Procedure informs Examiners of the distinction between obviousness-type double patenting and prior art obviousness under § 103, and specifically notes that a double patenting rejection is not one based on the prior art. *See* MPEP § 804 (II)(B)(1) ("A double patenting rejection of the obviousness-type is analogous to a failure to meet the [prior art] nonobviousness requirement of 35 U.S.C. § 103 ***except that the patent principally underlying the double patenting rejection is not considered prior art***," citing *In re Braithwaite*, 379 F.2d 594 (CCPA 1967) (quotations modified; emphasis added).

---

[3]     *See also In re Bartfeld*, 925 F.2d 1450, 1453 (Fed. Cir. 1991) (discussing the basic difference between obviousness-type double patenting rejections and standard obviousness rejections: "Double patenting depends entirely on what is *claimed* in an issued patent. Obviousness relates to what is disclosed (whether or not claimed) in a prior art reference (whether or not a patent). A prior art reference that renders claimed subject matter obvious under 35 U.S.C. § 103 does not necessarily create an obviousness-type double patenting situation.") (emphasis in original).

Case law also recognizes that an obviousness-type double patenting rejection does not involve review of the disclosure portion of a prior art patent, as would obviousness under § 103. "Because nonstatutory [i.e., obvousness-type] double patenting compares earlier and later claims, *an earlier patent's disclosure is not available to show nonstatutory double patenting.*" *Geneva*, 349 F.3d at 1385 (emphasis added).

In short, in its invalidity/obviousness case under 35 U.S.C. § 103, ClearCube will address the relevance of portions of the prior art '404 patent not considered by the Examiner, namely the disclosure or written description portion of that patent. There is no evidence in the prosecution history record to conclude that the disclosure portion of the '404 patent was understood to be prior art, or was reviewed in consideration of any of he claims in the patents-in-suit.

It turns out then that the double patenting rejection as issued in the '442 application is simply irrelevant to the issues that will be tried, and in no way does ClearCube's invalidity argument concerning obviousness represent an issue that was in any way considered by the patent office concerning the subject matters claimed in the patents-in-suit. Moreover, because "obviousness-type double patenting" and "prior-art obviousness" could easily seem or sound similar to a lay jury, and because the doctrines are both complex in and of themselves, the potential for confusion and prejudice is quite great indeed.

* * * * *

Therefore, ClearCube moves this court for a motion in limine precluding

Avocent from proffering argument or evidence, expressly or by implication:

(1)   concerning the double patenting rejection issued in the '442 application,

(2)   that the '404 patent was considered by the patent office as prior art to the patents-in-suit, and

(3)   that the '404 patent was known or understood by the patent office to constitute prior art to the patents in suit.

Respectfully submitted,

Dated:  June 16, 2006

J. David Cabello
Russell T. Wong
Wong, Cabello, Lutsch,
       Rutherford & Brucculeri, L.L.P.
20333 State Hwy. 249, Suite 600
Houston, TX 77070
Houston, TX 77070
Telephone:        (832) 446-2400
Facsimile:        (832) 446-2424
**ATTORNEYS FOR DEFENDANT**
**CLEARCUBE TECHNOLOGY CORPORATION**

**OF COUNSEL:**

Harlan I. Prater, IV
Lightfoot, Franklin & White, L.L.C.
The Clark Building
400 20th Street North
Birmingham, AL 35203

Tel: (205) 581-0720
Fax: (205) 581-0799

Joseph M Cloud
Joseph M. Cloud, P.C.

521 Madison Street                     Tel: (256) 534-0545
Suite 35801                            Fax: (256) 534-8475
Huntsville, AL 35801

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2006, I electronically filed the foregoing **BRIEF IN SUPPORT OF MOTION IN LIMINE REGARDING PATENT OFFICE CONSIDERATION OF THE '404 PATENT AS "PRIOR ART"** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

<table>
<tr>
<td>

J. Jeffery Rich., Esq.<br>
Sirote & Permutt, P.C.<br>
305 Church Street, Suite 800<br>
P. O. Box 18248<br>
Huntsville, Alabama 35804

</td>
<td>

James D. Berquist, Esq.<br>
Michael R. Casey, Esq.<br>
J. Scott Davidson, Esq.<br>
Peter W. Gowdey, Esq.<br>
Donald L. Jackson, Esq.<br>
Davidson Berquist Jackson & Gowdey, LLP<br>
4300 Wilson Blvd., 7th Floor<br>
Arlington, Virginia 22203

</td>
</tr>
</table>

Respectfully submitted,

*Stacey L. Alston*

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

AVOCENT HUNTSVILLE CORP.,

an Alabama corporation,

Plaintiff,

v.

CLEARCUBE TECHNOLOGY, INC.,

a Texas corporation,

Defendant.

Civil Action No. CV-03-S-2875-NE

## DEFENDANT CLEARCUBE'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE ON LOST PROFITS, IRREPARABLE HARM, AND COMPANY SIZE / LOCATION

### INTRODUCTION

Over two and a half years, Avocent Huntsville, Corp. ("Plaintiff" or "Avocent") brought this suit against Clearcube Technology Inc. ("Clearcube" or "Defendant") for patent infringement. In its Complaint, Plaintiff alleges "irreparable harm" and "lost profits," but has failed to provide any evidence as to irreparable harm and only on the eve of trial has produced evidence of lost profits. Further, despite its disclosure obligations under the Federal Rules, Plaintiff has similarly failed to produce any evidence relating to secondary considerations of non-obviousness. Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 37(c) precludes use of any evidence that was not previously timely disclosed. The purpose of this

1

rule is to prevent unfair surprise.  A motion in limine is a proper motion to exclude such evidence from the upcoming trial in order to avoid interruption and confusion of the jury at trial, thus prejudicing the Defendant's rights.  In addition, Defendant seeks to prevent Plaintiff from turning the trial into a battle of David and Goliath by precluding evidence relating to Plaintiff's size or location, as it is entirely irrelevant and should be precluded in accordance with Federal Rule of Evidence ("F.R.E") 401 – 403.  Accordingly, for the foregoing reasons, Defendant seeks an order to preclude Plaintiff from submitting evidence at trial as to lost profits, irreparable harm, secondary considerations of non-obviousness, and size and location of Plaintiff.

## BACKGROUND FACTS

Initial disclosures from the parties were due to be served by March 26, 2004, with fact discovery opening on March 8, 2004.  Plaintiff submitted its initial disclosures on March 26, 2004, but did not provide a damage computation in the initial disclosure, and provided the name of only one witness that may have evidence relating to damages.  On March 19, 2004, Defendant served its first document requests and its first set of interrogatories, requesting information relating to Plaintiff's claims of irreparable harm, lost profits and regarding secondary considerations of non-obviousness.  While many of the requests probed for information relating to these topics, Request Nos. 82 and 89 specifically sought evidence relating to Plaintiff's allegations of irreparable harm and lost profits.

2

Similarly, Request No. 37 expressly sought evidence as to secondary considerations of non-obviousness.  Likewise, interrogatory No. 10 sought information relating to Plaintiff's claim of damages in any form, including any irreparable harm.  Plaintiff served its written responses on April 21, 2004 and documents were subsequently produced.  Plaintiff did not, however, identify through written response or through document production any evidence relating to lost profits, irreparable harm or secondary considerations of non-obviousness.  Plaintiff further failed to supplement its initial disclosures or responses to discovery requests with any evidence relating to irreparable harm, lost profits or secondary considerations of non-obviousness.[1]  It was not until the discovery period had been closed for over a year and a half, when Plaintiff produced on the eve of trial evidence relating to its alleged lost profits.  Despite its obligations under the Federal Rules, Plaintiff has failed to timely provide any evidence as to lost profits and has failed in its entirety to produce any evidence relating to irreparable harm or secondary considerations of non-obviousness.  Accordingly, evidence relating to any of these three topics should be automatically excluded under Rule 37(c).

_____

[1] Plaintiff's response to Defendant's discovery requests were to argue that such requests were premature expert discovery. However, even after expert discovery, Plaintiff failed to supplement its responses with any evidence as to these topics.

**ARGUMENT**

I.  **Lost profits, Irreparable Harm and Secondary Considerations of Non-Obviousness**

    A.  **Evidence Of Lost Profits, Irreparable Harm and Secondary Considerations of Non-Obviousness Should Be Precluded at Trial.**

The Federal Rules governing discovery are designed to ensure early and full disclosure of evidence used to support claims and defenses.  *See Tarlton v. Cumberland County Correctional Facility*, 192 F.R.D. 165, 168 (D.N.J. 2000).  To that end, Fed. R. Civ. P. 37(c)(1) states that "[a] party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, *unless such failure is harmless*, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.   (Emphasis added).   The purpose of these rules is to eliminate surprise at trial.  *See, e.g., American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (citations omitted).  Rule 37 is designed as a "strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion..."  1993 Advisory Committee Note to amended Rule 37(c)(1).  To ensure such disclosure, the rule "provides for 'automatic' exclusion of witnesses and information that was not disclosed despite a duty to disclose."  *Henrietta D. v. Guiliani*, No. 95-CV-0641, 2001 U.S. Dist. LEXIS 21848, (E.D.N.Y 2001) (attached

for the Court's convenience).  Indeed, the sanction of exclusion is automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26 was substantially justified or harmless. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230-31 (7th Cir. 1996) (affirming exclusion of chart and jar that had not been disclosed); *Barner v. City of Harvey, et al.,* 1998 U.S. Dist. LEXIS 14937, *16 (N.D. Ill. 1998) (striking and excluding information in affidavit which was not properly disclosed under Rule 26) (a copy is attached for the Court's convenience).

In addition to the discovery duty imposed by Fed. R. Civ. P. 26, the local rules for the Northern District of Alabama are similar to the Federal Rules and mandate timely initial disclosures, which disclosures require that the parties make **any and all documents** available on which the party intends to rely to support its contentions with respect to **any significant factual issue** in the case.   LR 26.1(a)(1)(B). Similarly, a party is required to provide a computation of **any category of damages** claimed by it, including **all materials** on which the computation is based.   LR 26.1(a)(1)(C).  Likewise, a party is required to timely report the identity of witnesses that may have knowledge concerning significant factual issues raised by the pleadings and requires that the disclosure report the subject about which the witness is to testify.  LR 26.1(a)(1)(A).  Moreover, Local Rule 26.1(a) clearly states that a party "is not excused from making its disclosures because it has not completed its investigation of the case."  The standard scheduling order for the Northern District

of Alabama requires initial disclosures in compliance Local Rule 26.1.   The local rules for the Northern District of Alabama are enforced via Federal Rule 16, which provides for entry of a scheduling order and provides for sanctions for failure to comply with such an order.  *See* Fed. R. Civ. P. 16(b), (f).  Rule 16 states that "if a party or party's attorney fails to obey a scheduling …order…, the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the order provided in Rule 37(b)(2)(B), (C), or (D)."  *Id.* 16(f).  Rule 37(c)(1), in turn, allows the district court to exclude evidence or issue other "appropriate sanctions."  *Id.* 37(c)(1).  Thus, the applicable sanction provision, Rule 16(f), permits the court to impose the same sanctions set forth in Rule 37(c).  *See Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001); *Burney v. Rheem Mfg. Co.*, 196 F.R.D. 659, 691 (M.D. Ala. 2000).

Automatic exclusion of evidence under Rule 37 is typically avoided only where the "failure is 'harmless' or there was 'substantial justification' for the failure."  *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998); *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998) ("the required sanction in the ordinary case is mandatory preclusion"); *Burney*, 196 F.R.D. at 691 ("a party that fails to make the required disclosures shall not, unless such failure is harmless, be permitted to use [undisclosed] evidence at a trial"); *Snow v. Bellamy Mfg. & Repair, No. 1:94-*

6

*CV-957,* 1995 WL 902210, at *4 (N.D. Ga. Sept.26, 1995) (a "party who fails to so disclose must present 'substantial justification' for the lack of disclosure to avoid a sanction"). It is the non-moving party's burden to "show that its actions were substantially justified or harmless." *Stallworth,* 199 F.R.D. at 368.

For the reasons discussed below, Plaintiff's failure to identify or produce documents relating to irreparable harm, lost profits and secondary considerations of non-obviousness is neither substantially justified nor harmless.

### 1.    Plaintiff's Disclosure Violations Are Not Justified

"Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact." *Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc.,* 2005 U.S. Dist. LEXIS 41745 (M.D. Fla. 2005) (quoting *Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 680 (D. Kan. 1995)). "The test of substantial justification is satisfied if 'there exists a genuine dispute concerning a party's discovery compliance." *Stallworth,* 199 F.R.D. at 368. There is no question that Plaintiff did not comply with its discovery obligations.

Fed. R. Civ. P. 26(a)(1), like Local Rule 26.1(a)(1), required Plaintiff to describe all documents it "may use to support [its] claims or defenses…," identify witnesses and the subjects on which they may have knowledge, and provide a

computation of damages with any and all underlying evidence relating to damages. Despite its duty under the Federal Rules, Plaintiff did not list any documents relating to irreparable harm, lost profits or secondary considerations of non-obviousness, did not identify any witnesses that would testify as to any of these topics and did not provide a computation of damages or any evidence underlying the damages claim. Similarly, Fed. R. Civ. P. 26(e)(1) places a duty upon parties to supplement their Rule 26 disclosures at appropriate intervals "if the party learns that in some material respect the information disclosed is *incomplete...*"  Plaintiff has not amended its disclosures or its responses to discovery requests to provide any evidence regarding irreparable harm or secondary considerations of non-obviousness, and only after discovery has closed and at the eleventh hour has provided evidence as to lost profits.  Parties who fail to fulfill their disclosure duties under Rule 26 court the automatic and mandatory exclusion sanctions of Fed. R. Civ. P. 37(c)(1).

Not only did Plaintiff violate the provisions of Rule 26 requiring disclosure, but Plaintiff failed to comply with its duty to produce documents relating to lost profits, irreparable harm or secondary considerations[2] of non-obviousness in response to Defendant's discovery requests.  Indeed, Defendant served several document requests and interrogatories relating to Plaintiff's recitation of irreparable harm and lost profits in its Complaint, and regarding secondary considerations of

---

[2] Except for a general conclusory allegation of "commercial success."

non-obviousness.   Notwithstanding these requests, Plaintiff waited until the eve of trial, almost a year and a half after the close of discovery, to produce, for the first time, responsive documents relating to lost profits.   To date, Plaintiff has yet to produce any evidence of irreparable harm or relating to secondary considerations of non-obviousness.

To make matters worse, Plaintiff has not even attempted to explain its egregious conduct.   As one court explained:

> "[i]t is not an excuse that counsel did not know about [certain documents].
> Counsel had a duty to explain to their client what types of information
> would be relevant and responsive to discovery requests and ask how and
> where relevant documents may be maintained."

*Tarlton*, 192 F.R.D. at 170.   Because Plaintiff should have been aware of the existence of evidence of lost profits prior to the eve of trial, there is no substantial justification for not disclosing the evidence earlier.   *Stallworth*, 199 F.R.D. at 369. Further, Plaintiff should not be allowed to submit evidence, whether documentary or testimonial, at trial as to irreparable harm and secondary considerations of non-obviousness as their failure to disclose any evidence relating to these topics similarly lacks substantial justification, as Plaintiff has had over two and half years to provide such evidence, and has failed to do so.

## 2. **Plaintiff's Failure Was Not Harmless.**

A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been

produced.  *Go Medical Indus. Pty, Ltd. V. Inmed Corp.*, 300 F.Supp.2d 1297, 1308

(N.D. Ga. 2003); *Stallworth*, 199 F.R.D. at 369; *Burney*, 196 F.R.D. at 691.

Plaintiff's failure to disclose was more than a simple "honest mistake," and

Defendant had no prior knowledge of such evidence, such that Defendant could have

used the valuable discovery time to inquire further and analyze information relating

to irreparable harm, lost profits and secondary considerations of non-obviousness.

Indeed, Defendant relied on Plaintiff's disclosures in framing its discovery requests,

taking depositions, analyzing its strategy, filing various motions and in preparing for

trial.  Plaintiff's incomplete (and potentially inaccurate) discovery responses misled

Defendant as to what issues would be disputed at trial, what discovery requests were

necessary, what questions to ask and how to prepare its own case defending against

Plaintiff's patent infringement claims.   Accordingly, Plaintiff's failure to disclose

evidence relating to irreparable harm, lost profits and secondary considerations of

non-obviousness was not "harmless," and any evidence relating to these topics

should thus be excluded in accordance with Rule 37(c)(1).  *See Stallworth*, 199

F.R.D. at 369 (harm to party in having to respond to new material at late stage in

action).

## II.   Avocent's Claim for Lost Profits Fails.

Avocent's claim for lost profits fails because it is undisputed that Avocent's

only damages expert, Dr. William O. Kerr, has not performed the work necessary to

establish whether Avocent is entitled to recover lost profits, and thus his opinion as to whether a claim for lost profits exists is based on speculation and guesswork.

In order to recover lost profits, "the patent owner must provide: (1) demand for the patented produce, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) **the amount of the profit he would have made**." *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)(emphasis added). The "patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326 (Fed. Cit. 1987). A claim for lost profits cannot be based on speculation. *Id.* at 1327.

Dr. Kerr's opinion regarding lost profits claim is based **solely** on speculation. Dr. Kerr has failed to perform the work necessary to establish an opinion as to whether a claim for lost profits exists. Dr. Kerr has admitted that he has not applied the *Panduit* factors to the facts of this case to determine if lost profits are recoverable. In fact, Dr. Kerr has admitted that he has not prepared any reports that support the proposition that Avocent is entitled to lost profits. Dr. Kerr has done nothing to quantify a lost profits claim.

## III.   Size and Location of Plaintiff

### A.   The size and location of Plaintiff and its operations are Irrelevant and Should Be Excluded From Evidence At Trial.

11

"A fact or proposition is 'relevant' if it has a tendency to make the proposition it is offered to prove more probably so than if the evidence were not introduced. The proposition that the evidence is offered to prove must of course be '**material**' or the evidence may not be received.  [FRE 401 requires that] the proffered evidence must be relevant to prove a position that is itself '**of consequence to the determination of the action**,' i.e., material to the lawsuit." *U.S. v. Fountain*, 2 F.3d 656, 667 n.7 (6th Cir. 1993) (emphasis added).  However, even if the evidence is "relevant," the evidence may be excluded if the value of the evidence is substantially outweighed by the danger of unfair prejudice.  F.R.E. 403.  "'Unfair prejudice' in the context of balancing evidence means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.  Evidence is prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instincts to punish...'"  *U.S. v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (citing Advisory Committee Notes on FRE 401-403).  Indeed, "courts should be sensitive to any unfair advantage that results from the capacity of the evidence to persuade by illegitimate means."  *U.S. v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982); *see also Loussier v. Universal Music Group, Inc.*, 2005 U.S. Dist. LEXIS 37545 (S.D.N.Y. 2005) (court in copyright infringement case excluded "David and Goliath" type evidence because any probative value is substantially outweighed by

the danger of unfair prejudice that might result from jurors basing their conclusions on the relative wealth of the parties).

Evidence of size of Plaintiff's company or the location of Plaintiff's business is not relevant to any issue in this patent infringement case, and is clearly not relevant to any determinative issue in the case.  While evidence of company size may be relevant as to the alleged infringer, Plaintiff is the patentee in this case and as such, this information is clearly irrelevant.  Similarly, the location of Plaintiff and the fact that it is a local company is irrelevant to any issue in the case, especially any determinative issue.  Even if this information were relevant, however, the evidence should be excluded on grounds of undue prejudice to the Defendant.  Indeed, juries are often sympathetic to the "David's" of the world, especially when the defendant may be categorized as a "Goliath."  Admission of this evidence would unfairly prejudice the jury against Defendant by turning the trial into a battle of David and Goliath.  Likewise, juries are more sympathetic to local businesses which may employ friends or acquaintances of jury members, and admission of such evidence would similarly unfairly prejudice the jury against Defendant by turning the trial into a battle of the hometown company against the outsider.  Accordingly, Plaintiff should be precluded from presenting any evidence as to its company size or location.

## CONCLUSION

Unless Plaintiff's "new evidence" of lost profits, and any evidence that Plaintiff may generate in these last few weeks before trial relating to irreparable harm and secondary considerations of non-obviousness, as well as evidence of Plaintiff's size and location, is excluded from consideration, Defendant will suffer incalculable harm.   Had Plaintiff exercised even minimal due diligence, it would have located the evidence regarding lost profits during discovery, and at a minimum before the eve of trial.   Plaintiff must therefore accept the consequences of that decision – being precluded from now introducing evidence regarding lost profits, and from introducing evidence now or at trial relating to irreparable harm and secondary considerations of non-obviousness.   Given the harm to Defendant, it is simply too late for Plaintiff to provide "new evidence" on these topics. Additionally, evidence of Plaintiff's size and location should likewise be excluded from evidence because it is simply irrelevant to this litigation.   Accordingly, to prevent unfair prejudice to the Defendant and to eliminate any further surprise to the Defendant or this Court, Defendant's Motion In Limine to exclude any evidence submitted by Plaintiff as to irreparable harm, lost profits, secondary considerations of non-obviousness, and size and location of Plaintiff should be granted at this time.

14

Respectfully submitted,

Dated: 6/16/06

J. David Cabello
Russell T. Wong
**Wong, Cabello, Lutsch,**
    **Rutherford & Brucculeri, L.L.P.**
20333 State Hwy. 249, Suite 600
Houston, TX 77070
Telephone:    (832) 446-2400
Facsimile:    (832) 446-2424
**ATTORNEYS FOR DEFENDANT**
**CLEARCUBE TECHNOLOGY, INC.**

**OF COUNSEL:**
Harlan I. Prater, IV
**Lightfoot, Franklin & White, L.L.C.**
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0720
Fax: (205) 581-0799

Joseph M. Cloud
**Joseph M. Cloud, P.C.**
521 Madison Street
Suite 35801
Huntsville, AL 35801
Tel: (256) 534-0545
Fax: (256) 534-8475

## CERTIFICATE OF SERVICE

I hereby certify that on _June 16, 2006_ , I electronically filed the foregoing **DEFENDANT CLEARCUBE'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE ON LOST PROFITS, IRREPARABLE HARM, AND COMPANY SIZE / LOCATION BRIEF IN SUPPORT OF CLEARCUBE MOTION IN LIMINE TESTIMONY ON LOST PROFITS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| J. Jeffery Rich., Esq. | James D. Berquist, Esq. |
| Sirote & Permutt, P.C. | Donald L. Jackson, Esq. |
| 305 Church Street, Suite 800 | Peter W. Gowdey, Esq. |
| P. O. Box 18248 | Davidson Berquist Klima & Jackson LLP |
| Huntsville, Alabama 35804 | 4501 N. Fairfax Drive, Suite 920 |
| | Arlington, Virginia 22203 |

I further certify that I have served the foregoing on the following via first-class mail, postage prepaid:

J. Scott Davidson, Esq.
**Davidson Berquist Klima & Jackson LLP**
4501 N. Fairfax Drive, Suite 920
Arlington, Virginia 22203

Respectfully submitted,

_Stacy L. Alston_

2001 U.S. Dist. LEXIS 21848, *

**HENRIETTA D., NIDIA S., SIMONE A., EZZARD S., JOHN R. and PEDRO R. on behalf of themselves and others similarly situated, Plaintiffs, -against- RUDOLPH GIULIANI, Mayor of the City of New York, MARVA HAMMONS, Administrator of the New York City Human Resources Administration, and MARY E. GLASS, Commissioner of the New York State Department of Social Services, Defendants.**

**95 CV 0641 (SJ)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 21848*

**December 11, 2001, Decided
December 19, 2001, Filed**

**PRIOR HISTORY:** *Henrietta D. v. Giuliani, 2001 U.S. Dist. LEXIS 21849* (E.D.N.Y. July 12, 2001)

**DISPOSITION: [*1]** Magistrate Judge Pollak's Report and Recommendation affirmed and adopted. Plaintiffs' motion to strike granted and City Defendants' motion to stay denied.

**COUNSEL:** Susan J. Kohlmann, Esq., Karen B. Dine, Esq., David W. Oakland, Esq., Heather B. Conoboy, Esq., Of Counsel, Carolina A. Fornos, Esq., Of Counsel, PILLSBURY WINTHROP LLP, Victoria Neilson, Esq., HIV LAW PROJECT, Armen H. Merjian, Esq., Virginia Shubert, Esq., HOUSING WORKS, INC., New York, New York, for Plaintiffs.

Adam G. Kurtz, Esq., Georgia Pestana, Esq., Of Counsel, MICHAEL D. HESS, Corporation Cousel of the City of New York, New York, New York, Michael B. Siller, Assistant Attorney General, ELIOT SPITZER, Attorney General of the State of New York, New York, New York, for Defendants.

**JUDGES:** Sterling Johnson, Jr., U.S.D.J.

**OPINIONBY:** Sterling Johnson, Jr.

**OPINION:**

MEMORANDUM AND ORDER

JOHNSON, District Judge:

On February 14, 1995, Plaintiffs, indigent New York City residents who suffer from AIDS or HIV-related illnesses, commenced this class action against Defendants claiming violations of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12131*, et. seq., the Medicaid Act, Section 504 of **[*2]** the Rehabilitation Act of 1973 ("Rehabilitation Act"), *29 U.S.C. § 794,* and various other state and federal laws. Plaintiffs allege that the Division of AIDS Services and Income Support ("DASIS"), a division of the New York City Human Resources Administration ("HRA"), and the agency charged with assisting persons with AIDS or HIV-related illnesses in obtaining public assistance benefits and services, failed to provide Plaintiffs with meaningful and equal access to public benefits and services as required by state and federal law. This Court conducted a bench trial and on September 18, 2000 issued a Memorandum and Order detailing its findings of fact and conclusions of law.

This Court found that Defendants had chronically and systematically denied Plaintiffs meaningful access to critical subsistence benefits in contravention of the ADA and the Rehabilitation Act, and accordingly, granted the declaratory judgment and permanent injunction sought by the Plaintiff class. Specifically, this Court determined that the statute which created DASIS and defined its mandate contained the reasonable accommodations requested by Plaintiffs, and that the City's failure to comply **[*3]** with DASIS law violated the ADA and the Rehabilitation Act. In addition, this Court found that Defendant New York State had failed in its duty, as imposed by New York State law, to supervise the City in the provision of public benefits and services.

The Court appointed United States Magistrate Judge Cheryl L. Pollak to monitor compliance with the terms of the September 18, 2000 order for a period of three years from the date of its issuance. Magistrate Judge Pollak met with the parties over a period of several months in order to ensure compliance with this Court's decision and to fashion a mechanism and procedure for remedying the violations found by this Court. The parties submitted a proposed remedial order to Magistrate Judge Pollak who, on July 12, 2001, issued a Report and Recommendation (the "Report"). For the reasons stated herein, the Court adopts Magistrate Judge Pollak's Report in its entirety.

## I. REPORT AND RECOMMENDATION

A district court judge may designate a magistrate to hear and determine certain pre-trial motions pending before the court and to submit to the court proposed findings of fact and recommendations as to the disposition of the motion. See [*4] *28 U.S.C. § 636*(b)(1). Within ten days of service of the recommendation, any party may file written objections to the magistrate's report. Id. Upon *de novo* review of those portions of the record to which objections are made, the district court may accept, reject, or modify the recommendations made by the magistrate. Id.

The court, however, is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. See *Thomas v. Arn, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985)*. In addition, failure to file timely objections may waive the right to appeal the magistrate's decision. See *28 U.S.C. § 636*(b)(1); *Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)*. While the level of scrutiny entailed by the court's review of the report depends on whether or not objections have been filed, in either case the court is free, after review, to accept, reject, or modify any of the magistrate judge's findings or recommendations. [*5] See *Wood v. Schweiker, 537 F. Supp. 660, 661 (D.S.C. 1982)*.

Both City and State Defendants raise several objections to Magistrate Judge Pollack's Report and Recommendation, most of which were thoroughly addressed by the Magistrate in her Report. To the extent that these objections were considered by the Magistrate, this Court declines to revisit them here.

In addition to generally objecting to the entry of any order against it, State Defendant makes a number of specific objections to Magistrate Judge Pollak's Report. For instance, State Defendant objects to paragraph 6 of the Proposed Order which requires State Defendant to "supervise City Defendants' provision of benefits and services in accordance with Paragraph 1 of this Order." (Report at 42-43.) The Magistrate found that "paragraph 6 of the Proposed order merely requires State Defendant to comply with the mandates of New York law," as set forth in *New York Social Services Law § 20(2)(b)*. (Report at 43.) State Defendant contends that this Court, in its January 24, 2000 opinion in this action, *Henrietta D. v. Giuliani, 81 F. Supp. 2d 425 (E.D.N.Y. 2000)*, dismissed Plaintiffs' state law supervisory [*6] claims against State Defendant as barred by the Eleventh Amendment. State Defendant cites this Court's January 24, 2000 opinion where the Court stated that "State De-

fendants are correct in noting that the Supreme Court in Pennhurst held that the Eleventh Amendment bars federal courts from enjoining state officials from violating state law." *81 F. Supp. 2d at 431*, citing *Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 120-121, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984)*. While State Defendant is correct in its assertion that this Court previously held that Plaintiffs' state law claims are barred by the Eleventh Amendment, State Defendant ignores the fact that this Court also stated that Plaintiffs could use state law, and evidence of State Defendant's liability under it, to prove that State Defendant is in violation of federal law. See id. State Defendant, therefore, confuses references to New York State Law as an order from this Court requiring State Defendant to comply with New York State Law. Consequently, this Court finds that State Defendant's objections to paragraph 6 of the Proposed Order are without merit.

In its objections to paragraphs [*7] 11 and 12 of the Proposed Order, State Defendant argues that the Proposed Order "should be modified so that there is an informal resolution system, like that stipulated to by plaintiffs in the Piron stipulation (at P 17)." (State Mem. at 14.) As Plaintiffs' point out, State Defendant is raising this argument for the first time; it was not presented before Magistrate Judge Pollak. It is well established that issues that were not raised before the Magistrate "may not properly be deemed 'objections' to any finding or recommendation made in the Report and Recommendation." *Robinson v. Keane, 1999 U.S. Dist. LEXIS 9766, 1999 WL 459811*, at *4 (S.D.N.Y. 1999) citing *Riddell Sports, Inc. v. Brooks, 1997 U.S. Dist. LEXIS 3621, 1997 WL 148818*, at *4 (S.D.N.Y. 1997). "An objecting party may not raise new arguments that were not made before the Magistrate Judge." Id.; see also *Abu-Nassar v. Elders Futures, Inc., 1994 U.S. Dist. LEXIS 11470, 1994 WL 445638*, at *4 n.2 (S.D.N.Y. 1994) (refusing to entertain new arguments not raised before the Magistrate Judge and holding that to do otherwise "would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance [*8] additional arguments") (citations omitted). Therefore, State Defendant's failure to raise the issue of an informal resolution system before Magistrate Judge Pollak precludes them from raising it at this time.

Upon *de novo* review of the Report and Recommendation, and after careful consideration of the parties' objections, the Court affirms and adopts Magistrate Judge Pollak's Report in its entirety.

## II. MOTION TO STRIKE

Presently before this Court is Plaintiffs' motion to strike the declarations of Gregory Mark Caldwell and John Maher, which City Defendants submitted in support

of their objections to Magistrate Judge Pollak's Report and Recommendation. Plaintiffs object to the inclusion of the declarations on several grounds. First, Plaintiffs contend that the declarations contain many factual assertions which were neither made at trial nor presented before Magistrate Judge Pollak, and that "notions of fair play" should bar City Defendants from supplementing their case at this stage of the litigation. Second, Plaintiffs point out that the Declaration of Gregory Mark Caldwell refers to a 1999 audit report of waiting times at certain DASIS centers (annexed as Exhibit [*9] A to the Caldwell Declaration). According to Plaintiffs, this audit report was never produced during pre-trial discovery although it was directly responsive to Plaintiffs' document request. Plaintiffs argue that the entire Caldwell Declaration should be stricken as a sanction against City Defendants pursuant to *Federal Rules of Civil Procedure 37(b)(2)(B)* and (c)(1). Third, with regard to arguments that were presented to Magistrate Judge Pollak, Plaintiffs argue that the declarations are an impermissible attempt by Defendants to supplement the record for appeal. For the reasons stated herein, the Court grants Plaintiffs' motion to strike.

### A. Declaration of John Maher

*Federal Rule of Civil Procedure 72(b)* states that a "district judge *may* accept, reject or modify the recommended decision, *receive further evidence*, or recommit the matter to the magistrate judge with instructions." (emphasis added). While Rule 72(b) gives district courts the discretion to consider "further evidence," district courts will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. [*10] See *United States v. Pena, 51 F. Supp. 2d 364, 367 (W.D.N.Y. 1998)*; see also *Robinson v. Keane, 1999 U.S. Dist. LEXIS 9766, 1999 WL 459811*, at *4 (S.D.N.Y. 1999) (concluding that "an objecting party may not raise new arguments that were not made before the Magistrate Judge"); *Abu-Nassar v. Elders Futures, Inc., 1994 U.S. Dist. LEXIS 11470, 1994 WL 445638*, at *4 n.2 (S.D.N.Y. 1994) (refusing to entertain new arguments not raised before Magistrate Judge and holding that do otherwise "would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments") (citations omitted).

The United States Court of Appeals for the Second Circuit has consistently upheld the exercise of a district court's discretion to refuse to allow supplementation of the record upon the district court's *de novo* review. See *Hynes v. Squillace, 143 F.3d 653, 656 (2d Cir. 1998)*; *Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir. 1994)* (finding no abuse of discretion in district court's refusal to consider supplemental evidence);

*Pan Am. World Airways, Inc. v. International Bhd. of Teamsters, 894 F.2d 36, 40 n.3 (2d Cir. 1990)* [*11] (holding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"). Reasons of efficiency and fairness prompt this Court to exercise its discretion to refuse to consider evidence that was not presented before the magistrate judge. Therefore, information contained in the Declaration of John Maher that was not addressed to Magistrate Judge Pollak will not be considered by this Court.

City Defendants argue, however, that the Declaration of John Maher does not present new facts, but rather attempts to summarize information for this Court that was discussed with and argued before Magistrate Judge Pollak. City Defendants contend that the Maher Declaration focuses exclusively on the Fair Hearings and Appeal Unit ("FHAU"), and that the FHAU was an issue the parties discussed with Magistrate Judge Pollak at length. This Court agrees with Plaintiffs in that, to the extent that the FHAU was fairly considered by Magistrate Judge Pollak, the Maher Declaration only improperly serves to supplement the record for appeal. Accordingly, [*12] Plaintiffs' motion to strike the Declaration of John Maher is granted.

### B. Declaration of Gregory Mark Caldwell

Plaintiffs contend that the Declaration of Gregory Mark Caldwell should be stricken as a sanction for City Defendants' failure to comply with pre-trial discovery. In Plaintiffs' Document Request No. 6, Plaintiffs requested "all quality review or quality control reports that include information on IS/AS or DAS operations." (Pls.' Mem. at 5.) Plaintiffs argue that the 1999 audit report of waiting times at certain DASIS centers, which is referred to in the Caldwell Declaration and annexed thereto as Exhibit A, is directly responsive to Plaintiffs' discovery request.

*Federal Rule of Civil Procedure 37(c)* provides, in pertinent part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Rule 37(c) was amended in 1993 and now "provides for the 'automatic' exclusion of witnesses and information

that was not disclosed despite a duty **[\*13]** to disclose under Rule 26(a) or Rule 26(e)(1)." *Hinton v. Patnaude, 162 F.R.D. 435, 439 (N.D.N.Y. 1995).* However, while Rule 37(c) imposes an automatic sanction for failure to comply with discovery, Rule 37(c) does caution that the penalty should not apply if the offending party's failure to disclose was "substantially justified." Substantial justification means "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request" *Nguyen v. IBP, Inc., 162 F.R.D. 675, 680 (D. Kan. 1995).* The test of substantial justification is satisfied if "there exists a genuine dispute concerning compliance." Id. Furthermore, even in the absence of substantial justification, the Rule 37 exclusion should not apply if the "failure is harmless." *Fed. R. Civ. P. 37(c)(1).*

In City Defendants' opposition to Plaintiffs' motion to strike, City Defendants offer as their sole justification for not producing the 1999 audit report that "it is not certain whether the audit report created in 1999 was responsive to Request No. 6 which was served in 1995 and was subject to discussion **[\*14]** and tailoring." (City Defs.' Reply Mem. at 19.) As Plaintiffs point out, Plaintiffs assisted City Defendants with discovery in good faith, to the point of reviewing sample reports to determine their relevancy. City Defendants, therefore, cannot now argue that it is uncertain whether the 1999 audit report was responsive to Plaintiffs' request. Furthermore, apart from the initial request in 1995, Plaintiffs reminded City Defendants, on at least four other occasions, of their ongoing duty to produce documents similar to the 1999 audit report. (Pls.' Reply Mem. at 6.) There can be no question that City Defendants were required to produce the 1999 audit report in response to Plaintiffs' Request No. 6. Considering the length of time City Defendants had to produce the document in question, the Court finds that City Defendants' conduct constitutes flagrant bad faith and a callous disregard of the Federal Rules of Civil Procedure. *Hinton, 162 F.R.D. at 439* (explaining that the "imposition of sanctions under Rule 37 . . . should only be applied . . . where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure."); see **[\*15]** also *Sterling v. Interlake Indus. Inc., 154 F.R.D. 579, 587 (E.D.N.Y. 1994).* Additionally, City Defendants have not offered a "substantial justification" necessary to excuse their failure to disclose.

The Court also finds that City Defendants' failure to disclose was not harmless. "Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure." *Nguyen, 162 F.R.D. at 680.* Again, the burden is on City Defendants to establish harmlessness. See id. City Defendants in

their opposition papers to Plaintiffs' motion to strike do not even address the issue of harmlessness.

Upon the facts presented to the Court, City Defendants' failure to disclose was not harmless. Plaintiffs have not been afforded an opportunity to review the document at issue, to question witnesses about the document, or to refute its contents on the record. A party's inability to effectively cross-examine a witness or to rebut testimony constitutes severe prejudice, and can serve as the basis for precluding evidence that is not produced until after trial. See *GSGSB, Inc. v. New York Yankees, 1996 U.S. Dist. LEXIS 10646, No. 91 Civ. 1803, 1996 WL 456044, at \*20 (S.D.N.Y. Aug. 12, 1996).* **[\*16]** Additionally, notions of fair play suggest that City Defendants should be barred from introducing the document at this stage of the litigation.

Having determined that City Defendants should be sanctioned for their failure to disclose pursuant to Rule 37, this Court must next decide whether to strike only the 1999 audit report or to strike the entire Caldwell Declaration. *Federal Rule of Civil Procedure 37(b)* requires that the sanctions imposed be both just and specifically related to the particular claim at issue. See *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 707, 72 L. Ed. 2d 492, 102 S. Ct. 2099 (1982).* While this Court concedes Defendants' point that the Caldwell Declaration concerns more than the audit, striking the report alone would not satisfy the purpose underlying the Rule 37 sanctions. The audit report itself makes little sense without Mr. Caldwell's explanation of its significance. Due to the difficulty in separating out the discussion of the audit report from the Declaration, the Court finds that the appropriate action in this case is to strike the entire Declaration. Striking the **[\*17]** entire Declaration is also just in light of City Defendants' history of generally obstructive behavior. Accordingly, Plaintiffs' motion to strike the Caldwell Declaration in its entirety is granted.

## III. MOTION TO STAY

Also before the Court is City Defendants' motion to stay the judgment pending appeal pursuant to *Rule 8(a) of the Federal Rules of Appellate Procedure.* Rule 8(a) states that "[a] party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal." n1 This Court must consider four factors in determining whether to grant City Defendants' motion to stay: (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated "a substantial possibility, although less than a likelihood, of success" on appeal, and (4) the public interests that may be affected."

*Hirschfeld v. Board of Elections, 984 F.2d 35, 39 (2d Cir. 1993)* (citations omitted).

n1 This Court notes that City Defendants' motion to stay is untimely since a final judgment has not been entered in the case. However, for purposes of judicial economy and efficiency, the Court will decide the motion at this time.

**[*18]**

City Defendants argue that they "will suffer irreparable harm if they are immediately required to meet the staffing ratios mandated in paragraph 2 at each DASIS Center and to implement the Troubleshooter and allow site visits by plaintiffs' counsel as required by paragraph 4." The issue of the staffing ratios will be addressed first. Pursuant to DASIS law, DASIS is required to provide plaintiffs with "intensive case management with an average ratio which shall not exceed one caseworker or supervisor to twenty-five cases, and with an overall ratio for all cases which shall not exceed one caseworker or supervisor to thirty-four cases." N.Y. City Admin. Code § 21-127(i). Among its findings, this Court found a systemic failure on the part of DASIS to provide intensive case management to members of the plaintiff class, and found City Defendants to be in violation of the maximum ratios established by the legislature to ensure the provision of benefits and services to Plaintiffs. It was the local legislature who determined the ratios of twenty-five to one and thirty-four to one to be reasonable, and paragraph 2 of the Proposed Order simply directs City Defendants to comply with the law. **[*19]** n2 City Defendants, therefore, cannot argue that complying with their own mandates constitutes irreparable harm. Any quarrel City Defendants may have with the above-cited ratios is more appropriately addressed to the local legislature, rather than this Court.

n2 The Court disagrees with City Defendants' interpretation of N.Y. City Admin. Code § 21-127(i). City Defendants contend that the local law mandates overall staffing ratios for single and family cases, rather than imposes particular staffing ratios at each center.

In addition, contrary to City Defendants' argument, the Proposed Order does not require "precise staffing ratios," but rather establishes only the minimum floor from which City Defendants can build. The Court also notes that City Defendants have now had over a year since this Court's judgment to prepare for compliance. As a result, City Defendants' argument that paragraph 2 of the Proposed Order "will create turmoil in the expansion plan" is disingenuous at best. (City Defs.' Mem. at 12.) In **[*20]** implementing their expansion plans, City Defendants were more than aware that they would be required to meet certain staffing ratios. The Court agrees with Plaintiffs that City Defendants could have and still can easily incorporate these ratios into their expansion plans.

Turning next to the issue of the Troubleshooter program, City Defendants argue that the Fair Hearing Appeals Unit ("FHAU") will be irreparably harmed if they are required to "reinstitute the Troubleshooter." (City Defs.' Mem. at 12.) Following this Court's September 18, 2000 Memorandum and Order, the Troubleshooter program was instituted in an effort to expedite resolution of problems experienced by DASIS clients. Reports provided to Magistrate Judge Pollak indicate that the Troubleshooter program has been operating with great success. (Report at 24.) City Defendants, who envision the FHAU as replacing the Troubleshooter program, contend that DASIS clients will be confused if presented with two avenues for submitting complaints to DASIS. The Court finds City Defendants' argument to be without merit.

As of August 2001, the FHAU was not fully operational. City Defendants had not yet mailed notices to clients, nor **[*21]** had they made available at DASIS centers posters and other materials. Furthermore, in her Report and Recommendation, Magistrate Judge Pollak determined that "whatever confusion may result will be de minimus compared to the enormous benefit that the Troubleshooter will and already has provided to the plaintiff class and to this Court in its role as monitor." (Report at 28.) In addition, in the event that the FHAU proves to be successful, as City Defendants project, the Proposed Order allows for the discontinuation of the Troubleshooter program. Accordingly, City Defendants will not suffer irreparable harm if the Proposed Order goes into effect.

City Defendants also argue that Plaintiffs will not suffer substantial injury if a stay is granted because DASIS "had begun to address the case management problems this Court found existed at the Kingsbridge and Bergen Centers by making plans to handle the growing caseload in the Bronx." (City Defs.' Mem. at 13.) City Defendants further contend that Plaintiffs will not suffer substantial injury because "renovations and rewiring of centers will continue and the delivery of DASIS' new automated case management system . . . is ahead of schedule. **[*22]** Consequently, there has already been improvement and will continue to be improvement in the provision of case management services." (City Defs.' Mem. at 13.) Plaintiffs, however, point out that presently DASIS does not have an automated system in place, and that DASIS is not meeting the intensive case manage-

ment ratios as required by local law. The Court agrees with Plaintiffs in that future plans or promises do not satisfy City Defendants' burden of showing that Plaintiffs will not suffer substantial injury.

In granting Plaintiffs' request for a permanent injunction, this Court specifically found that Plaintiffs are being irreparably harmed by City Defendants' failure to provide Plaintiffs with meaningful access to critical subsistence benefits and services. This failure has devastating consequences for Plaintiffs. In this case, a stay will only prolong Plaintiffs' substantial injury.

City Defendants further argue that Plaintiffs will not suffer substantial injury if the Troubleshooter program is stayed. As stated previously however, the FHAU is not yet fully operational. In addition, to the extent that the FHAU is operational, the FHAU was established to specifically address the [*23] lack of a fair hearing process for DASIS-specific benefits and/or services, and is not designed to "remedy the vast majority of violations concerning benefits for which the client is entitled to a State Fair Hearing." (Pls.' Mem. at 16.) In contrast, the Troubleshooter program is designed to handle the full range of problems faced by DASIS clients, from long delays at DASIS centers to DASIS' failure to abide by fair hearing decisions. Therefore, staying the Troubleshooter program will result in substantial injury to Plaintiffs.

The third factor to be considered by a court in determining whether to grant a stay is whether the movant has demonstrated a substantial possibility of success on appeal. City Defendants argue that they "have a substantial possibility of success on their argument that this Court's decision was contrary to the Second Circuit precedent requiring plaintiffs under Title II of the ADA and the Rehabilitation Act to prove that, because of their disability, they have been denied benefits and services that are available to the non-disabled." (City Defs.' Mem. at 14.) The Court does not dispute City Defendants's contention that under the ADA, the crucial analysis is [*24] whether plaintiffs seek a reasonable accommodation to gain meaningful access to benefits and services available to the non-disabled or seek substantively different benefits than those available to the non-disabled. *Wright v. Giuliani, 230 F.3d 543 (2d Cir. 2000)* (citing *Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999))*. City Defendants, however, ignore the fact that this Court

determined in its Memorandum and Order that "DASIS was created to serve as a *reasonable accommodation* to [Plaintiffs'] disability, a "ramp," as it were, to assist them in accessing and maintaining the social welfare benefits and services to which they are entitled." (Memorandum and Order P 146) (emphasis added). Without a fully functioning DASIS, City Defendants cannot provide Plaintiffs with an "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." Id. Since this case is about the process through which a DASIS client receives a benefit or service generally available to the public, the line of cases cited by City Defendants are inapposite to this case.

In addition, [*25] City Defendants' liability was not based solely on the ADA and the Rehabilitation Act. This Court found City Defendants to also be in violation of the Medicaid Act, the Food Stamps Act, and numerous state and city laws, for which City Defendants present no arguments. City Defendants, therefore, have failed to meet their burden of establishing a substantial possibility of success on appeal.

Lastly, as Plaintiffs are persons who suffer from AIDS and HIV-related illness, granting the stay requested by City Defendants does not serve the public interest. Rather, it is in the public interest that Plaintiffs be given meaningful access to the benefits and services to which they are entitled as soon as feasibly possible. This Court finds that the balance of factors clearly weigh against granting a stay. City Defendants' application for a stay pending appeal is hereby DENIED.

## CONCLUSION

For the foregoing reasons, this Court affirms and adopts Magistrate Judge Pollak's Report and Recommendation. This Court grants Plaintiffs' motion to strike and denies City Defendants' motion to stay.

Dated: December 11, 2001

Brooklyn, New York

Sterling Johnson, Jr.

U.S.D.J

1998 U.S. Dist. LEXIS 14937, *

**EZELLA BARNER, MYRTHA BARNER, JOYCE V. BROWN, RONALD BURGE, BARBARA L. CHALMERS, CHARLES L. CLARK, RODERICK HAYNES, RUFUS FISHER, HENRY JEFFERSON, MITCHELL VERSHER, DENARD EAVES, LEE GRAY, on behalf of themselves and all others similarly situated, Plaintiffs, v. CITY OF HARVEY, NICHOLAS GRAVES, CHRISTOPHER BARTON, PHILLIP HARDIMAN, CAMILLE DAMIANI, FRANK PIEKARSKY, DONALD WHITTED, and MARY ANN SAMPSON, individually and in their official capacities, Defendants.**

No. 95 C 3316

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 14937*

**September 16, 1998, Decided**
**September 18, 1998, Docketed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment GRANTED IN PART and DENIED IN PART.

**COUNSEL:** For EZELLA BARNER, MYRTHA BARNER, JOYCE V BROWN, RONALD BURGE, BARBARA L CHALMERS, CHARLES L CLARK, RODERICK HAYNES, RUFUS A FISHER, HENRY JEFFERSON, MITCHELL VERSHER, DENARD EAVES, LEE GRAY, plaintiffs: Mary Stowell, Linda Debra Friedman, Erika E. Pedersen, Leng, Stowell, Friedman & Vernon, Chicago, IL.

For EZELLA BARNER, MYRTHA BARNER, JOYCE V BROWN, RONALD BURGE, BARBARA L CHALMERS, CHARLES L CLARK, RODERICK HAYNES, RUFUS A FISHER, HENRY JEFFERSON, MITCHELL VERSHER, DENARD EAVES, LEE GRAY, plaintiffs: Peter Scott Rukin, Attorney at Law, New York, NY.

For EZELLA BARNER, MYRTHA BARNER, JOYCE V BROWN, RONALD BURGE, BARBARA L CHALMERS, CHARLES L CLARK, RODERICK HAYNES, RUFUS A FISHER, HENRY JEFFERSON, MITCHELL VERSHER, DENARD EAVES, LEE GRAY, WILLIE B ROBINSON, plaintiffs: Max C. Fischer, Stowell, Friedman & Vernon, Chicago, IL.

For WILLIE B ROBINSON, plaintiff: Michael Sennett, Emma B. Rodriguez Brittain, Bell, Boyd & Lloyd, Chicago, IL.

For WILLIE B ROBINSON, plaintiff: Andrew H. Kim, Bell Boyd & Lloyd, Chicago, IL.

For CITY OF HARVEY, NICHOLAS GRAVES, CHRISTOPHER BARTON, PHILIP [*2] T HARDIMAN, CAMILLE DAMIANI, FRANK PIEKARSKY, DONALD WHITTED, MARY ANN SAMPSON, defendants: Lawrence Jay Weiner, Patrick J. Broncato, Scariano, Kula, Ellch & Himes, Chtd., Chicago, IL.

For CITY OF HARVEY, NICHOLAS GRAVES, CHRISTOPHER BARTON, PHILIP T HARDIMAN, FRANK PIEKARSKY, DONALD WHITTED, MARY ANN SAMPSON, defendants: Terrie L. Culver, Holstein, Mack & Klein, Chicago, IL.

For CITY OF HARVEY, NICHOLAS GRAVES, CHRISTOPHER BARTON, PHILIP T HARDIMAN, FRANK PIEKARSKY, DONALD WHITTED, MARY ANN SAMPSON, defendants: Raymond A. Hauser, Todd Kenneth Hayden, Kelly A Hayden, Scariano, Kula, Ellch & Himes, Chtd., Chicago Heights, IL.

For CITY OF HARVEY, NICHOLAS GRAVES, CHRISTOPHER BARTON, PHILIP T HARDIMAN, FRANK PIEKARSKY, DONALD WHITTED, MARY ANN SAMPSON, defendants: Anthony Bernard Bass, Blatt, Hammesfahr & Eaton, Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINIONBY:** David H. Coar

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Before this court is Defendants City of Harvey's ("City" or "Harvey"), Nicholas Graves' ("Graves"),

Christopher Barton's ("Barton"), Phillip Hardiman's ("Hardiman"), Camille Damiani's ("Damiani"), Frank Piekarsky's ("Piekarsky"), Donald Whitted's [*3] ("Whitted"), and Mary Ann Sampson's ("Sampson") (collectively "Defendants") motion for summary judgment on Plaintiffs Ezella Barner's ("E. Barner"), Myrtha Barner's ("M. Barner"), Joyce V. Brown's ("Brown"), Ronald Burge's ("Burge"), Barbara L. Chalmers' ("Chalmers"), Charles L. Clark's ("Clark"), Roderick Haynes's ("Haynes"), Rufus Fisher's ("Fisher"), Henry Jefferson's ("Jefferson"), Mitchell Versher's ("Versher"), Denard Eaves's ("Eaves"), and Lee Gray's ("Gray") (collectively "Plaintiffs") class action complaint alleging: Violation of the Fourteenth Amendment Due Process Clause pursuant to *42 U.S.C. § 1983*(Count I), racial discrimination in violation of the Fourteenth Amendment Equal Protection Clause pursuant to *42 U.S.C. § § 1981, 1983* (Count II), retaliation in violation of the First Amendment Free Speech Clause pursuant to *42 U.S.C. § 1983* (Count III), civil conspiracy in violation of *42 U.S.C. § 1985*(3) (Count IV), violation of *42 U.S.C. § 1986* (Count V), libel per se and false light of Burge by Graves(Count VI), failure to pay compensatory time off, sick leave, vacation time, pension benefits, and other monies due to Plaintiffs in violation of the Fair Labor Standards Act, [*4] Illinois Wage and Collection Act, and Plaintiffs' employment contracts and as retaliation in violation of the First Amendment, the Fourteenth Amendment, Title VII, *42 U.S.C. § § 1981*, 1983, and 1985(3), and the Illinois Wage and Collection Act (Count VII), racial discrimination in violation of Title VII against the City of Harvey (Count VIII), retaliation in violation of Title VII against the City of Harvey (Count IX), libel per se and false light of Eaves by Barton (Count X), and retaliation against Eaves by the City of Harvey in violation of Title VII (Count XI).

For the reasons given below, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment on Count I is GRANTED as to Brown, Clark, Jefferson, Versher, Haynes, and Burge and DENIED as to E. Barner, M. Barner, Fisher, Eaves, and Gray. n1 Summary judgment as to Counts II and VII is GRANTED as to Haynes and Burge and DENIED as to all other Plaintiffs. Summary judgment as to Count III is GRANTED as to Haynes, Burge, Fisher, and class members Silas and B. Moore and DENIED as to all other Plaintiffs. Summary judgment as to Counts IV and V is GRANTED as to Haynes and Burge but DENIED as to all [*5] other Plaintiffs. Count VI is DISMISSED. Summary judgment as to Counts VII and IX is GRANTED as to all class representatives other than Fisher. Summary judgment as to Counts X and XI is GRANTED. Additionally, Plaintiffs' motion to strike and Defendants' motion to strike are each GRANTED IN PART and DENIED IN PART as

noted throughout the opinion. All other pending motions are MOOT.

n1 Chalmers was not included in Count I.

## I. General challenges to the 12(M) and 12(N) Statements

Plaintiffs and Defendants challenge each other's Rule 12 submissions (Defendants' 12(M) Statement of Undisputed Material Facts and Plaintiffs' 12(N) Statement of Additional Facts) on a number of grounds in addition to the typical fact disputes. Some of these grounds are applied to large portions of the factual statements. The court will address these grounds generically in this section of the opinion and will address the grounds individually in the Facts section of this opinion where necessary.

### A. Plaintiffs' challenge to [*6] the Graves affidavit

A large number of Defendants' factual statements rely upon an affidavit given by Graves. Plaintiffs allege that some of the statements in the affidavit either contradict statements made by Graves in his deposition or else claim personal knowledge of facts that Graves disavowed personal knowledge of during his deposition. Courts are highly critical of efforts to patch up a party's deposition with his own subsequent affidavit." *Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir. 1995).* The court will disregard any statements in Graves' affidavit that contradict his deposition. See *id. at 67-68* ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."). Because of the nature of this challenge to the Graves affidavit, the court will consider each challenge individually within the fact section of this opinion.

### B. Defendants' challenges to depositions not taken as part of this case [*7]

Defendants challenge a number of statements supported by depositions not taken as part of this case. (See, e.g., Dft's 12(N) Resp. P 101 (challenging Arrington Dep.). Defendants' challenge, however, is misguided. "Depositions are admissible in summary judgment proceedings to establish the truth of what is . . . deposed provided, of course, that the . . . deponent's testimony would be admissible if he were testifying live." *Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997).* In the absence of a showing that a witness, such as Ar-

rington, could not testify at trial to what he stated when he was deposed, the court will allow the deposition in as evidence for summary judgment.

## C. Defendants' challenges to statements as based on "inadmissible hearsay"

Defendants challenge a large number of Plaintiffs' statements as based on "inadmissible hearsay." The vast majority of Defendants' "hearsay" challenges display fundamental misunderstandings of the meaning of "hearsay." Contrary to the Defendants' insinuations, not all out of court declarations are "hearsay." *Federal Rule of Evidence 801(c)* defines "hearsay" as "a statement, other than one made by the declarant [*8] while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The vast majority of the challenged statements do not meet this definition for one of two reasons: (1) they are "legally operative statements" and not admitted for the truth of the matter asserted or (2) they are admissions of party opponents. First, many of the statements are "legally operative statements," which are not hearsay. See, e.g., *Neal v. Honeywell, Inc., 995 F. Supp. 889, 893 n.4 (N.D. Ill. 1998).* Included in this category of challenged statements are alleged threats made toward some of the Plaintiffs, orders given to the Plaintiffs to perform certain tasks or to remain in certain places, and statements made to the Plaintiffs terminating their employment. Many of these statements have legal effect by the mere fact of their statement. Such statements are generally not for "the truth of the matter asserted," but rather to show the fact of the statement being made and for the effect of the statement on the hearer. Thus, the fact that a threat may have been made is admissible both because of the legal effect of making a threat and for its effect on the hearer. *Id.* [*9] *at 893.* n2 See also *Ficek v. Griffith Laboratories Inc., 1995 U.S. Dist. LEXIS 1153, 1995 WL 42081 n.8 (N.D. Ill. 1995)* (finding that graffiti in a sexual harassment action which was material to the action were "operative words" and not offered for the truth of the matter asserted). Similarly, such statements may be relevant to the Plaintiffs' understanding of the situation, *Bieganek v. Wilson, 1986 U.S. Dist. LEXIS 21472, 1986 WL 9192, *7 (N.D. Ill. 1986)* (stating that a hearsay challenge to an "operative document" which was relevant to the "plaintiffs' knowledge and understanding" was "decidedly spurious"), and may also explain Plaintiffs' subsequent actions. *United States v. Demopoulos, 506 F.2d 1171, 1175 (7th Cir. 1974).*

n2 As the court in Neal noted, such threats may also be admissible for the truth of the matter asserted both because they contain legally operative words (which are not hearsay) and because

they may be statements of the declarant's then existing state of mind. *995 F. Supp. at 893 n.4.*

Second, many of the statements challenged are [*10] admissions of party-opponents. n3 Many of the statements challenged as hearsay were made by a defendant; other statements are arguably admissions of either agents or co-conspirators of the defendants. While the court will look to the challenged statements individually, the court notes that it will consider for summary judgment purposes any admission that was made by a person who arguably was an agent or co-conspirator of one of the defendants. The court does emphasize, however, that its consideration of such statements at this stage in the litigation does not necessarily mean that the statements will ultimately be admissible at trial; Defendants, of course, remain able to challenge at trial the claim that a given declarant was their agent or co-conspirator.

n3 *Fed. R. Ev. 801(d)(2)* defines an admission by a party

## D. "Self-serving" statements by Plaintiffs.

Defendants challenge a number of statements as "self-serving" and, thus, inadmissible. This challenge is contrary to the standards for admissibility. [*11] Where a witness has personal knowledge of a fact, that witness may testify to that fact, regardless of whether that witness has a personal interest in the fact. Thus, where a witness has personal knowledge, for example, of his or her own political support of former Mayor David Johnson, that witness may testify to that political support, even though the result of such testimony is to place that witness within the class certified in this case. Thus, there the court will only strike statements challenged as "self-serving" if they are without a basis of personal knowledge.

## E. Challenges to Johnson and Graves affidavits

Both Plaintiffs and Defendants have offered affidavits from their respective mayoral candidate (Johnson for Plaintiffs and Graves for Defendants) and then challenged each other's mayoral affidavit on the ground that the mayors did not have personal knowledge about that which they are testifying. Additionally, Plaintiffs argue that some of Graves's statements in his affidavit contradict statements that Graves made in his deposition.

The general rule regarding admissibility of affidavits at summary judgment is that the affiant, like any witness in a case other [*12] than an expert witness, must only

testify to matters outside his personal knowledge. *Russell, 51 F.3d at 67*. Additionally, where a witness's affidavit contradicts the witness's sworn deposition, the affidavit will be disregarded. *Id. at 68* ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."). See also *McCarthy v. Kemper Life Insurance Co., 924 F.2d 683, 687 (7th Cir. 1991)* (A party "cannot effectively oppose a motion for summary judgment by contradicting his own deposition testimony.").

Defendants argue that Graves is presumed to have personal knowledge as an officer of the City of Harvey. There is no Seventh Circuit precedent in support of this claim, and the Fifth Circuit cases cited by Defendants are inapposite. *Dalton v. Federal Deposit Insurance Corp., 987 F.2d 1216, 1223 (5th Cir. 1993)* (admitting affidavit of FDIC account officer where account officer did not have personal knowledge when given [*13] transaction occurred but learned of it later; noting that all relevant documents forming the basis of the FDIC account officer's testimony were attached to the affidavit); *Federal Savings & Loan Insurance Corp. v. Griffin, 935 F.2d 691, 702 (5th Cir. 1991)* (admitting affidavit of senior bank attorney where affidavit demonstrated attorney's "personal knowledge to testify as a custodian of documents," where attorney had personal knowledge about some of the statements, and where all hearsay statements came within the business records exceptions and were supported by business records attached to the affidavit), cert. denied, *502 U.S. 1092, 112 S. Ct. 1163, 117 L. Ed. 2d 410 (1992)*. These cases in no way support a general claim that Graves can be presumed to have personal knowledge of everything that occurs within his government. In fact, two other judges on this court have rejected affidavits by corporate officers where the affiant officers failed to demonstrate personal knowledge. See *First National Bank of Louisville v. Continental Illinois National Bank and Trust Co. of Chicago, IL, 1989 U.S. Dist. LEXIS 15043, 1989 WL 157276, *1 (N.D. Ill. 1989)* (Conlon, J.); *Monroe v. United Air Lines, Inc., 1981* [*14] *WL 268, (N.D. Ill. 1981)* (Shadur, J.). Even if such a presumption existed, surely that presumption would be rebutted by Graves's admissions in his deposition that he lacked personal knowledge on a variety of the statements to which he attested in this affidavit. Similarly, Defendants' general claim that Graves could have attained personal knowledge of these facts between the time that he was deposed and the time that he signed his affidavit is of no use to them; Graves does not attest in his affidavit that he gained personal knowledge after his deposition

and, indeed, offers no facts even indicating that he personally attained any knowledge.

### F. Violations of Rule 26(a)

#### 1. Defendants' failure to disclose evidence pursuant to Rule 26(a)(5)

Plaintiffs argue that certain statements should be excluded because Defendants failed to disclose the facts and evidence relating to those statements pursuant to Plaintiffs' written interrogatories. Plaintiffs' Interrogatory 23 states (in pertinent part):

> For each Plaintiff whom Defendants claim his or her position was eliminated state the following:
>
> a. each and every reason why each named Plaintiff was selected [*15] for layoff or elimination of his or her position or termination;
>
> b. each and every person who made the decision or provided input into the decision to layoff or eliminate the position of or terminate each person identified in (a). With respect to each person identified:
>
>> i. Identify the documents each person identified in (b) above relied on or reviewed and the written or oral communications each person relied on, reviewed or participated in when controlling, reviewing, contributing to, recommending, or otherwise affecting or participating in the decision to layoff, eliminate the position of, or terminate each person identified in (a).

Defendants responded to Interrogatory 23 but did not include any mention of oral or written communications or documents regarding debts owed to Groen Waste Services, Illinois Department of Employment Security, Pinnacle Bank, Humana HMO, and American HMO. (See Dfts' 12(M) Stmt. PP 27-31 (citing to Graves aff. regarding debts).) Defendants had a duty under Fed. R. Ev. 26(a)(5) to respond to Plaintiffs' written interrogatories

and a duty under *Fed. R. Civ. P. 26(e)(1)* "to supplement at appropriate intervals its disclosures under [*16] [Fed. R. Civ. P. 26(a)] if [Defendants learned] that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to" Plaintiffs through the discovery process. Under *Fed R. Civ. P. 37(a)*, a "party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." n4 See also *McNabola v. Chicago Transit Authority, 10 F.3d 501, 517 (7th Cir. 1993)* (stating that failure to disclose documents justified exclusion of the documents). Rule 37(a)'s "sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado v. General Motors Corporation, 150 F.3d 735, 742, 1998 WL 409926, *5 (7th Cir. 1998)* (citing *Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996)).* Defendants have failed to establish either that its violation of Rule 26 (a) and (e)(1) was justified [*17] or harmless. Accordingly, Plaintiffs' Motion to Strike Graves's Affidavit is GRANTED IN PART and those statements in Graves's Affidavit and in Defendants' 12(M) Statements regarding the excluded evidence shall not be taken into consideration.

n4 Notably, while Rule 37(c)(1) states that additional sanctions "may" be imposed "on motion and after affording an opportunity to be heard," Rule 37(c)(1) makes exclusion of evidence a more automatic sanction and does not require the court to afford the nondisclosing party an opportunity to be heard. Because Plaintiffs addressed exclusion of this evidence in their Motion to Strike, Defendants did have an opportunity to be heard on exclusion of the evidence -- but failed to offer any response.

**2. Plaintiffs' failure to designate witness as an expert pursuant to Rule 26(a)(2)**

Rule 26(a)(2) requires parties to "disclose to other parties the identity of any person who may be used at trial to present evidence under *Rules 702, 703, or 705 of the Federal Rules of [*18] Evidence.*" *Fed. R. Civ. P. 26(a)(2)(A).* Plaintiffs did not disclose to Defendants any such expert testimony during the discovery period, but did attach a declaration by Michael S. Friedman to summaries prepared by Friedman that placed the City of Harvey personnel records into a database configuration. (See Plaintiffs' Ex. 2 (Friedman database summaries).) As Friedman's declaration makes clear, he is not acting as an expert in this case but, instead, acted solely to summarize voluminous documents "in the form of a chart, summary, or calculation," pursuant to *Fed. R. Ev. 1006.* His declaration includes no analysis of the data but instead explains the sources of his information and an attestation to the accuracy of the data as compared to the original documents. As Plaintiffs did not violate Rule 26(a)(2), Rule 37's exclusion principle does not apply.

**G. Other Local Rule 12(M) and 12(N) issues**

**1. Local Rule 12(M) and 12(N) violations**

The Local Rules for the Northern District of Illinois require a party submitting a motion for summary judgment to submit a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle [*19] the moving party to a judgment as a matter of law . . ." Local Rule 12(M). Local Rule 12(N) states that "all material facts set forth in the 12(M) statement will be deemed to be admitted unless controverted in the [12(N)] statement." Moreover, the party defending against summary judgment must point to specific portions of the record in support of its interpretation of the case, or the facts will be deemed admitted. See *Valenti v. Qualex, Inc., 970 F.2d 363, 369 (7th Cir.1992)* ("A Rule 12 responsive statement that is a flat denial, without reference to supporting materials, or with incorrect or improper references, and containing irrelevant additional facts, has no standing under Rule 12(N)."). See also *Waldridge v. American Hoechst Corp., 24 F.3d 918, 921-22 (7th Cir.1994)* (observing that the Seventh Circuit has "repeatedly upheld the strict enforcement of [Local District Rules 12(M) and 12(N)], sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts."). Both parties have raised challenges to their opponent's 12(M) and 12(N) statements [*20] and responses. The court will disregard any statements or responses by either party which do not meet the standards of Local Rules 12(M) and 12(N). However, where the court can track the statement to the underlying supporting materials, the statement will be considered..

**2. Statements of facts regarding civil service requirements**

Each of the parties (and Plaintiffs in particular) state a number of facts regarding the civil service requirements. The civil service requirements are not, however, an issue of fact, but, instead are an issue of law. While the court will note in the Facts section of this opinion facts regarding the individual Plaintiffs, which might be relevant to the ultimate determination of whether a given Plaintiff was covered by the protections of civil service, the court will consider the nature and requirements of

civil service in the City of Harvey in the Analysis section of the opinion.

### 3. Statements of fact regarding political affiliation

"In a case where a plaintiff asserts his own rights in an attempt to establish a First Amendment claim in an employment context, he must present evidence that his speech (or conduct) was constitutionally protected [*21] and that it was a substantial factor in his demotion." *Shanahan v. City of Chicago, 82 F.3d 776, 780 (7th Cir. 1996).* In a case, such as this one, where Plaintiffs claim that they were fired because of their political affiliation with a party, Plaintiffs must offer evidence tending to show that Defendants knew of their political affiliation. *Id. at 781.* See also *Bosques v. Kustra, 1994 U.S. Dist. LEXIS 16292, 1994 WL 866083, *8 (N.D. Ill. 1994)* (requiring plaintiff to show knowledge of political non-affiliation where plaintiff alleged discrimination based on non-affiliation with current administration). Plaintiffs cannot meet this burden of production merely by offering "hearsay statements from persons Plaintiff[s were] unable even to identify by name. *Bosques, 1994 WL 866083 at *8.* Similarly, it is not sufficient to make conclusory allegations about being "well known" as politically affiliated with a party or political candidate. *Cusson-Cobb v. O'Lessker, 953 F.2d 1079, 1081 (7th Cir. 1992).* In view of these requirements, the court will disregard any conclusory statements made by Plaintiffs claiming that Defendants knew or should have known of their political affiliation and will only consider [*22] evidence offered by Plaintiffs that affirmatively tends to show that Defendants knew of Plaintiffs' political affiliation.

### 3. Statements of fact regarding after-acquired evidence

Defendants offer evidence about Harvey's financial condition acquired after the various decisions to terminate Plaintiffs. Under the after-acquired evidence rule, such evidence is not admissible to prove that Defendants fired Plaintiffs for a legitimate business reason. See *McKennon v. Nashville Business Publishing Co., 513 U.S. 352, 360, 115 S. Ct. 879, 885, 130 L. Ed. 2d 852 (1995)* ("The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason."). See also *Kristufek v. Hussmann Foodservice Co., Toastmaster Division, 985 F.2d 364, 369 (7th Cir. 1993)* ("A discriminatory firing must be decided solely with respect to the known circumstances leading to the discharge. The deterring statutory penalty is for retaliatory firing, the character of which is not changed by some after discovered reason for discharge which might otherwise have been used, but was not."). n5 Thus, the court

will not consider any [*23] after-acquired evidence in this motion.

n5 Where an employer offers after-acquired evidence that would justify a termination (as is true here), front pay and reinstatement are inappropriate. *McKennon, 513 U.S. at 362, 115 S. Ct. at 886.* After-acquired evidence does not bar an employee's claim to back pay but does limit the amount of back pay to the period from the time of termination to the date that the evidence was acquired. Id. Such damages issues are not at issue in the current motion, which seeks summary judgment on the question of liability.

## II. Facts

Plaintiffs state that "other than agreeing that there was an election and that Johnson is no longer Mayor of Harvey, the parties agree on little else." (Ptf's Resp. Mem. at 2.) As hyperbolic as that sounds, it comes close to being the absolute truth: Plaintiffs and Defendants dispute bitterly the vast majority of the 600+ fact statements offered by the two sets of parties.

### A. Events

#### 1. The parties and other relevant persons [*24]

Plaintiffs, Ezella Barner ("E. Barner"), Myrtha Barner ("M. Barner"), Joyce V. Brown ("Brown"), Ronald Burge ("Burge"), Barbara L. Chalmers ("Chalmers"), Charles L. Clark ("Clark"), Rufus Fisher ("Fisher"), Henry Jefferson ("Jefferson"), Mitchell Versher ("Versher"), Denard Eaves ("Eaves"), and Lee Gray ("Gray") (collectively "Plaintiffs") are all former employees of Defendant the City of Harvey ("Harvey") and are all African-Americans. (Dfts' 12(M) Stmt. P 1.) Defendant Graves is currently the Mayor of Harvey, having defeated former Mayor Johnson in the April 4, 1995 election; Graves is white. (Dfts' 12(M) Stmt. P 2; Ptfs' 12(N) Stmt. PP 2-3.) Defendant Christopher Barton ("Barton") is the current Deputy Chief of Police of the Harvey Police Department; Barton is African-American (Dfts' 12(M) Stmt. P 3.) Defendant Philip Hardiman ("Hardiman") is the current Chief of Police of the Harvey Police Department; Hardiman is African-American. (Dfts' 12(M) Stmt. P 4.) Defendant Camille Damiani ("Damiani") is the current Commander for the Office of Professional Standards for the Harvey Police Department. (Dfts' 12(M) Stmt. P 5.) Defendant Alderman Frank Piekarski ("Piekarski") is currently [*25] an alderman in Harvey; Piekarski is white. (Dfts' 12(M) Stmt. P 6.) Defendant Alderman Donald Whitted ("Whitted") is currently an Alderman in Harvey; Whitted is African-

American. (Dfts' 12(M) Stmt. P 7.) Defendant Alderman Mary Ann Sampson is currently an Alderman in Harvey; Sampson is African-American. (Dfts' 12(M) Stmt. P 8.) John Arrington ("Arrington"), Gloria Taylor ("Taylor"), and Eric Kellogg ("Kellogg") are also Aldermen in Harvey; they are all African-American. (Dfts' 12(M) Stmt. P 9.)

Defendant Harvey is a municipal government organized under the laws of the state of Illinois. (Dfts' 12(M) Stmt. P 10.) As a "home rule" unit of local government, Harvey may exercise certain powers and perform certain functions pursuant to Article VII, § 6(a) of the 1970 Constitution. (Dfts' 12(M) Stmt. P 10.) The government of Harvey includes a City Council, a Mayor (with a staff of assistants and secretaries), and six departments: Police, Fire, Water, Streets, Planning, and Accounts and Finances. (Dfts' 12(M) Stmt. P 11.) Harvey also has a Civil Service Commission, comprised of three members appointed by the Mayor. (Dfts' 12(M) Stmt. P 12.) The population of Harvey in 1995 (the relevant [*26] year in this case) was approximately 30,000 people. (Dfts' 12(M) Stmt. P 13.)

### 2. Background facts

#### a. The April 1995 election

Former Mayor Johnson was elected Mayor in April 1983 and subsequently re-elected in 1987 and 1991. (Dfts' 12(M) Stmt. P 15; Ptfs' 12(N) Stmt. PP 1-2.) Johnson was defeated by the present mayor, Graves, in the election on April 4, 1995. (Dfts' 12(M) Stmt. P 15; Ptfs' 12(N) Stmt. P 3.) n6 At the time of the election in April of 1995, the racial composition of Harvey was 85.5% African-American and 13.9% White. (Dfts' 12(N) Resp. P 4.) The parties agree that the election was very heated. (Ptfs' 12(N) Stmt. P 6; Dfts' Ex. 81 (Graves Supp. Aff.) P 4.) One Harvey alderman stated that in the mayoral election "it seemed like it was -- everything was based on race," that Graves and his supporters harassed Johnson supporters, and that fights broke out in polling places and derogatory comments were made. (Ptfs' 12(N) Stmt. P 6; Kellogg Dep. at 7-8.) Graves states that "the tone of the campaign [was not] out of the ordinary" and that he neither directed that his supporters harass anyone nor made any comments regarding race in the election. (Dfts' Ex. 81 (Graves [*27] Supp. Dep.) P 4.) Graves was sworn in as Mayor of Harvey on April 13, 1995. (Ptfs' 12(N) Stmt. P 7.) n7

n6 Dfts' 12(M) Statement PP 16-19 are immaterial; Harvey's finances prior to Johnson's tenure and who had control of the budget is irrelevant to the issue of Plaintiffs' termination.

n7 Plaintiffs seek to include statements regarding the atmosphere in Harvey after the election. (See Ptfs' 12(N) Stmt. P 9.) Defendants correctly point out that several of the statements are either hearsay, without identification of the declarants, or are made without any showing of foundation, or both. The remaining statement, that "an alderman started a fund for persons set up and illegally charged by Graves and his white police officers," has not been shown to be materially relevant, i.e., to the issue of whether Graves and his alleged co-conspirators fired or constructively discharged persons within the plaintiffs' class.

The parties disagree about the atmosphere in Harvey after the election. Plaintiffs allege that [*28] City Council meetings were disruptive, that there was a heavy police presence at the meetings, including intimidation of persons who spoke against Graves, and that Graves physically attacked an alderman who had supported Johnson and harassed him for being "one of the former mayor's political friends." (Ptfs' 12(N) Stmt. P 10.) Defendants dispute these allegations, citing to affidavits from Graves and Barton. (Dfts' 12(N) Resp. P 10.) Graves admitted in his deposition that there were "heated debates" in the City Council about whether Graves was racist. (Dfts' Ex. 74 (Graves Dep.) at 31-32.)

#### b. Harvey's economic situation

Harvey had a budget deficit in 1994 that necessitated the layoff of some Harvey employees on October 7, 1994 and led Harvey to ask employees to take reductions in pay (Dfts' 12(M) Stmt. PP 20-21; Dfts' Ex. 4 (Johnson Dep.) at 91, 93); by April 1995, the employees laid off in October 1994 were rehired as a result of Harvey's improved fiscal condition, (Ptfs' 12(M) Resp. P 20; Dfts' Ex. 4 (Johnson Dep.) at 93-94), and the pay cut was removed as of October 28, 1994. (Ptfs' Ex. 31 (Johnson Dep., Blair v. City of Harvey).) n8 Harvey's appropriation ordinance from [*29] the 1994-95 budget year, signed by Johnson on July 28, 1994, indicates that expenditures had exceeded revenue by $ 631,906.70. (Dfts' 12(M) Stmt. P 24; Ptfs' 12(M) Resp. P 24; Dfts' Ex. 7 (1994-95 appropriation ord.) at 16.)

n8 Defendants' 12(M) Stmt. P 23 claims that Graves, as treasurer, knew about Harvey's financial condition and citing to Graves's affidavit P 11. This claim, however, is contradicted by Graves's deposition testimony:

Q. What was your job as city treasurer?
A. Nothing because they wouldn't let me look at any checkbooks. Took all the books away. Took

my authority away to go to the bank to even check on the accounts.
Q. Who's 'they'?
A. David Johnson.
. . . .
Q. And when did they stop letting you be the treasurer?
A. They didn't stop letting me be the treasurer. They just shut me off. Had no office, couldn't go to the bank, could get no records, could look at no checkbooks. I continued to be city treasurer, but I couldn't treasure.

(Dfts' Ex. 74 (Graves Dep.) at 246, 247). Having stated that, as treasurer, he had no ability to gain personal knowledge about the financial condition of the City of Harvey -- no access to the checkbooks, books, records, and accounts of the City of Harvey -- Graves's conclusory statement that he was "aware" of Harvey's financial condition as treasurer will be disregarded as contradictory to his deposition testimony..

[*30]

Graves states that one of his goals was to increase n9 the number of patrol officers. (Dfts' 12(M) Stmt. P 32.) n10 The parties disagree about the number of sworn patrol officers during the relevant time period. Plaintiffs state that the number of sworn police officers (patrol and supervisory) was 56 in the first week of April, 1995, 61 in August 1995, and 57 in October 1995. (Ptfs' 12(N) Stmt. P 32 (citing Ptfs' Ex. 2G (Police Department study)).) Defendants state that 47 sworn police officers were receiving pay for active duty on April 3, 1995, and that 63 sworn police officers were receiving pay for active duty on September 15, 1995. (Dfts' 12(N) Resp. P 32 (citing Freeman Aff., PP 10-11.) n11 Plaintiffs also state that the police department workforce changed from 75% African-American to 57% African-American between April and October 1995. (Ptfs' 12(N) Stmt. P 34.)

n9 Graves makes a number of statements about the police department prior to him taking office, (Dfts' 12(M) Stmt. P 33; Dfts' Ex. 1 (Graves Aff.) P 19), but offers no basis for his personal knowledge of such details as overtime pay, staffing of the department, and patrol shifts at a time when he was a member of or in charge of either the police department or mayoral office of the City of Harvey.

[*31]

n10 Defendants' 12(M) Stmt. P 32 also states that Graves "faced an admitted budget deficit." (Dfts' 12(M) Stmt. P 32 (citing Dfts' Ex. 1 (Graves Aff.) P 20.) This is in contradiction to Graves's deposition, where he stated that financial records were in a mess when he got into office, that the administration "knew to some extent, but we didn't know how extensive the amount of money the city owed and what we had in the bank," that records were missing and "to this day -- there's probably things that we don't know is missing that's missing." (Dfts' Ex. 74 (Graves Dep.) at 130-32.) Graves also admitted that Thomas Setchell ("Setchell") was the person who came in, "checked out all the accounts and found out where the money was, what we had, what we didn't have, what was due, what was owed. I mean, we knew to some extent, but not to the -- . . . ." (Dfts' Ex. 74 (Graves Dep.) at 135-36.) Graves admits that Setchell was not hired until July 3, 1995. (Dfts' Ex. 1 (Graves Aff.) at P 29.) Finally, Graves admitted to a Harvey Star reporter on April 16, 1995, "First thing we have to find out is where we're at money wise. The books haven't been brought up to date for over a year. We don't know if we're a dollar in debt or $ 20 million in the hole." (Ptfs' 12(N) Stmt. P 291. See also Dfts' 12(N) Resp. P 291 (admitting Graves's statement; stating "that when Graves took office, the audit for the 1994 fiscal year had not been completed. . . .").

[*32]

n11 Defendants object to Plaintiffs' Exhibits 2A-2G (Friedman summary of voluminous documents) on the grounds that they are not supported by the documents but do not offer any citation to the voluminous documents in order to challenge Friedman's summary. Similarly, Defendants cite to Freeman's affidavit as stating the correct numbers, but did not attach to Freeman's affidavit the documents supporting her argument or any documents indicating that her claim, as opposed to Friedman's summary, is correct. Thus, this is a factual dispute best left to the jury.

Graves states that he, along with his administrative assistant, Nick Forte ("Forte"), began to examine the positions in Harvey city government which might be expendable in order to enable Graves to increase the size of the police force; Graves gives no timeframe for when this examination took place. (Dfts' 12(M) Stmt. P 34.) Defendants admit that the terminations of Harvey city

employees began April 17, 1995, the day after Graves took office. (Ptfs' Ex. 4 (Harvey list of employees).) Graves also states that the decisions to abolish positions [*33] were based on Harvey's budget and the need for the position, that positions were abolished in all non-public safety departments of Harvey government, and that neither race nor political patronage was considered in determining which positions to abolish. (Dfts' 12(M) Stmt. P 35-36.) n12 Defendants admit that there was no set procedure for determining whom to lay off post-election. (Ptfs' Ex. 10 (Dfts' Resp. to Interrog) No. 24.) On various dates in April and May 1995, Graves sent most employees who were laid off the following termination letter:

A review of the current budget and cash on hand in the City indicates that there is a serious shortfall of revenue. Due to this shortfall, we are forced to make drastic personnel cuts. You are hereby advised that your position with the City of Harvey is hereby terminated. We thank you for your past service to the City.

(Dfts' 12(M) Stmt. P 37.) Decisions were made to terminate personnel employed in the Accounts and Finance, Planning, Water, and Streets Departments, as well as in the Mayor's Office. (Dfts' 12(M) Stmt. P 38.) None of the employees in these Departments had taken civil service examinations. (Dfts' 12(M) Stmt. P 38.) [*34] The following is a list of persons who received budget cut letters by name, race, and date:

| Name | Race | Date of letter of termination |
| --- | --- | --- |
| Cornelius Marshall | African American | 4-17-95 |
| George Brewton | African American | 4-17-95 |
| Herschel Dungey | African American | 4-17-95 |
| Phyllis Smallwood | African American | 4-17-95 |
| Donald Nesbit | African American | 4-17-95 |
| Ron Ayers | African American | 4-17-95 |
| Sarah Bell | African American | 4-17-95 |
| Chuck Givines | African American | 4-17-95 |
| Henry Jefferson | African American | 4-18-95 |
| Patsy Ross-Truitt | African American | 4-18-95 |
| Eric Glenn | African American | 4-18-95 |
| Robert Montgomery | African American | 4-18-95 |
| Henry Murphy | African American | 4-18-95 |
| Tonia Humphrey | African American | 4-18-95 |
| Bonnie Rateree | African American | 4-18-95 |
| Alvin Welch | African American | 4-19-95 |
| Arnold Tate | African American | 4-20-95 |
| Kerry Skurlock | African American | 4-21-95 |
| Rufus Fisher | African American | 4-24-95 |
| Barbara Chalmers | African American | 4-28-95 |
| Jeannetta McClellan | African American | 4-28-95 |
| Brenda Smith | African American | 4-28-95 |
| Debra Brown | African American | 4-28-95 |
| Renea Gholson | African American | 4-28-95 |
| Gilvonne Davis | African American | 4-28-95 |
| James Dixon | African American | 4-28-95 |
| Kevin Lindley | African American | 5-08-95 |
| Denise Kellogg | African American | 5-09-95 |
| Claude Rials | African American | 4-28-95 |
| Sandra Isom | African American | 6-02-95 |

[*35]

(Ptfs' 12(N) Stmt. P 15.) All 30 of the persons who received the termination letters were supporters of Johnson who worked for his campaign in some capacity. (Ptfs' 12(N) Stmt. P 16.)

> n12 Plaintiffs dispute this claim; to the extent that this claim simply states what Graves's testimony is, it is admissible. The court will consider all of the relevant evidence in determining whether Plaintiffs' race and political affiliation claims survive summary judgment.

Plaintiffs dispute Graves's claim that he made these decisions based on budgetary considerations or on a review of relevant documents. Defendants admit that when Graves assumed office on April 13, 1995, City Hall was a "chaotic mess," financial records were missing, papers were scattered everywhere, and Graves did not know what was missing. (Ptfs' 12(N) Stmt. P 12.) Graves admitted at his deposition in November 1997 that "we still hadn't figured it out." (Ptfs' 12(N) Stmt. P 12.) Thomas Setchell ("Setchell") was hired on July 3, 1995 to determine what [*36] was in Harvey's account and what was owed. (Ptfs' 12(N) Stmt. P 13.)

## B. Changes in employment in Harvey's departments and mayor's office

### 1. Accounts and Finance Department

According to Harvey's personnel records, the following persons were employed in the Accounts and Finances Departments prior to the Graves administration taking office:

| Employee | Position | Hire Date | Race |
|---|---|---|---|
| Sarah Bell | Controller | 11-28-94 | B |
| Tamara Cannon | Clerk | 11-09-93 | B |
| Teresa Dixon | A.P. Manager | 05-24-93 | B |
| Hershel Dungey | Personnel Dir. | 11-09-92 | B |
| Sandra Isom | Clerk | 02-21-95 | B |
| Camille Krencjarz-Soria | Clerk | 08-31-87 | W |
| Lorita Landa | Clerk | 07-16-91 | B |
| Oline Lanier | Secy/Pers. | 08-02-94 | B |
| Kathryn Leon | Accountant | 05-04-92 | B |
| Jeanetta McClellan | Clerk | 02-28-95 | B |
| n13Latresa Moore | Clerk | 04-25-94 | B |
| Henry Murphy | Pur. Agent | 02-14-94 | B |
| Patsy Ross-Truitt | Office Manager | 04-03-95 | B |

(Ptfs' Ex. 4 (Harvey empl. recs).) Out of the 13 employees, 12 were African-American (92.3%) and 1 was Caucasian (7.7%). After the Graves Administration took office, between April 17, 1995, and June 21, 1995, 8 employees, all African-American, either were terminated [*37] or resigned; these employees were Bell (terminated), T. Dixon (resigned), Dungey (terminated), Isom(terminated), McClellan (terminated), Moore (terminated), Murphy (terminated), and Ross-Truitt (terminated). (Ptfs' Ex. 4 (Harvey empl. recs); Dfts' Ex. 9 (budgetary termination letters); Dfts' 12(M) Stmt. PP 41-53).) The Graves Administration has hired 4 employees for the department:

| Employee | Position | Hiring | Race |
|---|---|---|---|
| Christine Ceja | Clerk | 07-17-95 | H |
| Hilda Esperanza | Clerk/Trans 7/97 | 04-29-96 | H |
| Scott Senour | Clerk | 12-04-95 | W |
| Thomas Setchell | Finance Director | 07-03-95 | W |

1998 U.S. Dist. LEXIS 14937, *

(Ptfs' Ex. 4 (Harvey empl. rec.).)) By the end of the class period, there were 7 employees in the department, including 4 African-Americans (57.1%), 1 Hispanic (14.3%), and 2 Caucasians (28.6%). Thus, on April 29, 1996, there were 9 employees in the department, including 4 African-Americans (44.4%), 2 Hispanics (22.2%), and 3 Caucasians (33.3%). Since April 29, 1996, 3 African-Americans (Landa, Lanier, and Leon) and 1 Caucasian (Senour) have left their employment; this leaves 5 employees in the Department, 1 African-American (20%), 2 Hispanics (40%), and 2 Caucasians (40%).

n13 Plaintiffs dispute that Moore was employed by the Finance and Accounting Departments but instead state that she was a member of the Water Department. However, in their own 12(N) Statement, Plaintiffs specifically state that Moore was a clerk in the Finance and Accounting Department. (See Ptfs' 12(N) Stmt. P 18.)

[*38]

Of the six clerks employed by the Johnson administration on April 4, 1995 (Tamara Cannon, Sandra Isom, Camille Krencjarz-Soria, Lorita Landa, Jeanetta McClellan, and Letresa Moore); Krencjarz-Soria is Causasian, and the other five are African-American.

(Ptfs' 12(N) Stmt. P 18-19.) Isom, Moore, and McClellan (all African-American) were terminated within two months of Graves taking office. (Dfts' 12(N) Resp. P 19.) Krencjarz-Soria, who is Caucasian and a Graves supporter, was elevated to be Office Manager; Teresa Dixon ("T. Dixon"), who is African-American and a Johnson supporter, states that she was demoted from Office Manager to Accounts Payable Manager, harassed by Krencjarz-Soria, and ultimately resigned due to the harassment. (T. Dixon Decl. at PP 3-4.) Landa, who is African-American and a Graves supporter, was retained in the department; T. Dixon states that she was forced to train Landa to take over Dixon's position as Accounts Payable Manager. (T. Dixon Decl. at P 5.) Defendants admit that Setchell, the Caucasian man hired as Finance Director, performs similar duties to those that Bell performed as Harvey's Comptroller. (Dfts' 12(M) Stmt. P 41.) Defendants admit that Dominic [*39] Forte ("Forte"), performs similar duties to those that Dungey performed as Harvey's Personnel Director. (Dfts' Ex. 1 (Graves Aff.) P 32.)

**2. Planning Department**

According to Harvey's personnel records, the following persons were employed in the Planning Department prior to the Graves administration taking office:

| Employee | Position | Date Hired | Race |
|---|---|---|---|
| Robert Ackerman | Bldg. Insp. | 02-23-87 | W |
| Debra Brown | Secretary | 09-15-94 | B |
| Leonard Campbell | Sr. Bldg. Insp. | 01-01-75 | B |
| Violetta Cullen | Sr. Planner | 08-29-94 | B |
| Christine Davis | Lot Alley Insp. | 02-25-81 | B |
| Renee Gholson | Health Insp. | 05-01-84 | B |
| Eric Glenn | Planner | 08-29-94 | B |
| Robert Montgomery | Planner | 08-29-94 | B |
| Art Neeley | Code Insp. | 10-05-92 | B |
| Ethelia Robertson | Secretary | 11-23-87 | B |
| Kerry Scurlock | Health Insp. | 01-11-93 | B |
| Phyllis Smallwood | Hous. Adm. | 07-09-91 | B |
| Brenda Smith | TRP | 08-23-93 | B |
| Valentine Lawanda | Adm. Asst. | 07-02-91 | B |

(Ptf's Ex. 4 (Harvey Empl. Rec.).) Prior to the Graves Administration taking office, there were 14 employees in the Planning Department, including 13 African-Americans (92.8%) and 1 Caucasian (7.1%). Between April 17, 1995, and April [*40] 28, 1995, the Graves

Administration terminated 8 employees, all African-American, including Brown, Gholson, Glenn, Montgomery, Neeley, Scurlock, Smallwood, and Smith. (Ptfs' Ex. 4 (Harvey Empl. Rec.).) The Graves Administration hired 4 employees for the Planning Department between April 24, 1995 and August 15, 1995:

| Employee | Position | Hire Date | Race |
|----------|----------|-----------|------|
| Theresa Alderson | Building & Zone Sec'y | 05-01-95 | B |
| Judy Seput | Sec'y | 08-15-95 | W |
| Linda Siller | Asst. Admin. | 05-15-95 | B |
| Brenda Thompson | Dir. Planning | 04-24-95 | B |

(Ptfs' Ex. 4 (Harvey Empl. Rec.).) Thus, at the end of the class period, there were 11 employees in the Planning Department, 9 African-American (81.8%) and 2 Caucasian (18.2%). In the time after the class period closed, 2 African-Americans and 1 Caucasian have been terminated or resigned, 1 Caucasian has transferred out of the Planning Department, and 2 African-Americans (Tawana Ashley, a secretary, and Joseph Frierson, a planner) and 1 Caucasian (Richard Gini, Fire and Building Inspector) have been hired. Thus, there are now 10 employees in the Planning Department, including 9 African-Americans (90%) and 1 Caucasian (10%).

Defendants [*41] allege that Gholson was terminated and her position abolished on April 28, 1995 for failing to return to work after Graves took office (Dfts' 12(M) Stmt. P 61 (citing Dfts' Ex. 1 (Graves Aff.) P 50).) Graves offers no basis for personal knowledge of Gholson's attendance record, and Gholson disputes the claim that she failed to attend work and notes that she was one of the employees terminated with a letter claiming budgetary reasons. (Gholson Decl. P 4.) The four employees hired by the Planning Department during the class period were all either Graves supporters or related to Graves supporters. (See Dfts' Ex. 74 (Graves Dep.) at 87 (stating that Thompson and Seput were Graves supporters and that Siller is Thompson's sister); id. at 93 (noting that Bill Alderson was a Graves supporter); Johnson Decl. P 20 (noting that Theresa Alderson is the daughter-in-law of Bill Alderson and that she is also a Graves supporter).) Plaintiffs also challenge the hiring of Alderson as a "Building & Zone Secretary" when other secretaries in the Department were terminated. (Ptfs' 12(N) Resp. P 70.)

### 3. Mayor's Office

According to Harvey's personnel records, the following persons were employed [*42] in the Mayor's Office prior to the Graves administration taking office:

| Employee | Position | Hiring Date | Race |
|----------|----------|-------------|------|
| Rita Allen | Secretary | 04-11-94 | B |
| Cheryl Anderson | Deputy Clerk | 04-23-91 | B |
| Ron Ayers | Pub. Rel. Dir. | 08-22-94 | B |
| Barbara Chalmers | Confidential Sec. | 06-02-94 | B |
| Gwendolyn Davis | City Clerk | 05-3-91 | B |
| Robin Denson-Williams | Part-time | 01-09-95 | B |
| Emma Foreman | Part-time | 09-26-94 | B |
| Tonia Humphrey | Asst. Pub. Rel. Dir. PT | 02-28-95 | B |
| Trense Ketchum | Cable (Part-time) | 12-03-93 | B |
| C. Marshall | Attorney | 07-06-93 | B |
| Michelle McHenry | Part-time | 05-19-94 | B |
| Jessie Pickett | Cable (Part-time) | 08-01-94 | B |
| Dorothy Prazes | Mayor's Recep. | 12-19-94 | B |
| Lamond Taylor | Admin. Aide/Rec. Clerk | 03-01-93 | B |
| Jake Williams | Cable (Part-time) | 12-03 93 | B |

(Ptfs' Ex. 4 (Harvey Empl. Rec.).) Prior to the Graves Administration taking office, there were 15 employees in the Mayor's Office, and all were African-American. Of

these 15 employees, 11 were separated from employment with Harvey between April 17, 1995 and July 21, 1995: Ayers (terminated, budget letter), Allen (terminated), Chalmers (terminated), Denson-Williams (terminated), Foreman (terminated), [*43] Ketchum (resigned), Mar-

Case 5:03-cv-02875-CLS    Document 220    Filed 06/16/06    Page 68 of 70

Page 13
1998 U.S. Dist. LEXIS 14937, *

shall (terminated), McHenry (terminated), Prazes (resigned), and Taylor (terminated, reduction). n14 Also

during the class period, the Graves Administration hired nine employees:

| Employee | Position | Date hired | Race |
|---|---|---|---|
| Bill Alderson | Pub. Rel. Dir. (PT) | 04-17-95 | B |
| Kim Bishop | Part-time | 08-28-95 | B |
| David Dillner | Attorney | 05-29-95 | W |
| Erania Dunn | Research Dir. | 04-17-95 | B |
| Nick Forte | Admin. Aid | 04-14-95 | W |
| Iris Hagans | Part-time (Cable) | 05-29-95 | W |
| Gloria Morningstar | Treasurer | 04-17-95 | W |
| Sandra Torres | Exec. Asst. | 05-23-95 | H |
| Hope Webster | Exec. Asst. | 05-01-95 | H |
| Dwain Whitted | Cable (Part-time) | 05-12-95 | B |

(Ptfs' Ex. 4 (Harvey Empl. Rec.).) Hagans resigned before the end of the class period. (Dfts' 12(M) Stmt. P 92.) Thus, at the end of the class period, there were 12 employees in the Mayor's Office, including 7 African-Americans (58.3%), 3 Caucasians (25%), and 2 Hispanics (16.7%). After the class period ended, Jake Williams resigned, leaving 11 employees in the Mayor's Office, 6 African-Americans (54.5%), 3 Caucasians (27.3%), and 2 Hispanics (18.2%).

n14 The parties are in conflict as to which office or department employed Taylor. Defendants' records appear to be in conflict, as well. (Compare Ptfs' Ex. 9 (Harvey Empl. Rec.) (stating that Taylor was employed by the Mayor's Office) with Dfts' Ex. 24 (Taylor Personnel File) (stating that Taylor was employed by the Police Department and then transferred to the Accounting and Finance Department).) Additionally, while Graves states in his affidavit (without showing any personal knowledge) that Taylor resigned, the reason given by Harvey's personnel records for Taylor leaving employment was "Reduction." (Dfts' Ex. 24 (Taylor Personnel File).) The court will consider Taylor as part of the Mayor's Office but notes that the confusion showed here is not atypical in this case.

[*44]

The parties disagree sharply about a number of the terminations and subsequent hirings. Defendants allege that Ayers was terminated for failing to attend work, but have admitted that he was one of the persons terminated

with a letter citing budgetary reasons; their only source for claiming that Ayers failed to attend work is

Graves's affidavit. (Dfts' 12(M) Stmt. P 77.) Defendants allege that Allen was secretary to the Chief Administrative Officer and that her position was abolished, while Plaintiffs state that Allen's title was "secretary" and note that other persons were hired to act as secretaries or clerks. (Dfts' 12(M) Stmt. P 78; Ptfs' 12(M) Resp. P 78.) While Plaintiffs' dispute the claim that Chalmers was a "confidential secretary," as opposed to a "secretary," they cite no materials; they do note that Webster, her replacement, was a Graves supporter. (Ptfs' 12(M) Resp. P 79.) While Defendants claim that Denson-Williams was a "part-time secretary" whose position was abolished, Plaintiffs correctly note that Defendants' employment records state that her position was "part-time," th same time as Bishop. (Dfts' 12(M) Stmt. P 80; Ptfs' 12(M) Resp. P 80.) Dillner, who replaced [*45] Marshall, an African-American supporter of Johnson, is Caucasian and a supporter of Graves. (Ptfs' 12(M) Resp. P 83.) Dunn and Torres, who were hired by Graves, are both Graves supporters. (Ptfs' 12(M) Resp. P 82.) Defendants, citing only Graves's affidavit, state that McHenry was the secretary for the civil service commission and that that position was abolished; however, not only did Graves admit at his deposition that the knew nothing of McHenry, but the civil service commission had no secretary and, thus, McHenry could not have served in that position. (Ptfs' 12(M) Resp. P 85; Dfts' Ex. 50 (L. Thomas Dep.) at 148 (no civil service commission secretary).)

The employees in the Mayor's Office did not take civil service examinations. (Dfts' 12(M) Stmt. P 75.)

### 4. Water Department

1998 U.S. Dist. LEXIS 14937, *

According to Harvey's personnel records, the following persons were employed in the Water Department prior to the Graves administration taking office

| Employee | Position | Hiring Date | Race |
|----------|----------|-------------|------|
| Wanda Appling | Asst. Manager | 09-12-91 | B |
| David Blair | Mgr. Office | 03-22-76 | W |
| Joyce Brown | Util. Coord. | 11-10-92 | B |
| Dennis Ciecerski | Meter Maint. | 12-15-80 | W |
| Lanedra Cobb | Office Mgr. | 06-19-67 | B |
| Bonnie Corona | Meter Maint. | 04-04-89 | W |
| Gilvonne Davis | Revenue Acct. | 01-11-93 | B |
| William Davis | Mgr. Field | 04-03-78 | W |
| Daphne Finley | Clerk | 07-25-94 | B |
| Rufus Fisher | Supt. | 11-12-71 | B |
| Errol Foulks | Mechanic | 09-06-89 | B |
| Ralph Golba | Pump Rm. Attn. | 02-16-66 | W |
| Sherrie Jackson | Pump Rm. Attn. | 12-19-83 | B |
| Henry Jefferson | Meter Repair | 07-12-89 | B |
| Martin Kalinowski | Meter Maint. | 01-28-85 | W |
| Kerry Keelen | Meter Reader | 04-20-82 | B |
| James Kemp | Pump Rm. Attn. | 07-22-76 | W |
| Sabrina King | Clerk | 08-04-93 | B |
| Annette Mitchell | Clerk | 09-12-91 | B |
| Richard Pierce | Meter Reader | 05-15-86 | B |
| Claude Rials | Clerk | 09-12-91 | B |
| Allie Richmond | Clerk | 05-11-93 | B |
| Maria Serrato | Clerk | 11-14-88 | H |
| John Seidl Sr. | Mechanic | 05-09-94 | W |
| Iris Sibby | Clerk (part-time) | 04-13-95 | B |
| Jonetta Smith | Clerk | 08-08-94 | B |
| William Smith | Welder/Mechanic | 09-08-80 | W |
| Lori Vasser | Pump Rm. Attn. | 04-01-86 | B |
| Charmaine Northern | Part-time Clerk | 02-08-95 | B |
| Monique Thurman | Part-time Clerk | 03-06-95 | B |

[*46]

(Ptfs' Ex. 4 (Harvey Empl. Rec.).) Prior to the Graves Administration taking office, there were 30 employees, 20 African-Americans (66.7%), 9 Caucasians (30%), and 1 Hispanic (3.3%). By the end of the class period, 7 employees, all African-American, were separated from employment, including Brown (terminated, budgetary letter), Davis (terminated, budgetary letter), Finley (terminated), Fisher (terminated, budgetary letter), Jefferson (terminated, budgetary letter), Rials (terminated during probationary period), and Sibby (resigned). (Dfts' 12(M) Stmt. P 102-08.) As no new employees were hired by the end of the class period, there were 23 employees in the Water Department at the end of the class period, 13 African-Americans (56.5%), 9 Caucasians (39.1%), and 1

Hispanic (4.3%). Since the end of the class period, Harvey has hired 1 full-time employee in the Water Department (Hispanic), hired a total of 13 part-time employees in the Water Department (7 African-American, 6 Caucasian), and had 10 part-time employees (6 African-American, 4 Caucasian) leave employment in the Water Department, leaving a total of 27 employees, 14 African-Americans (51.9%), 11 Caucasians (40.7%), and 2 Hispanics [*47] (7.4%). (Ptfs' Ex. 4 (Harvey Empl. Rec.).)

Plaintiffs and Defendants again differ on several details. First, Plaintiffs state that Latresa Moore worked in the Water Department, rather than the Finances and Accounting Department. (See L. Moore Decl. P 2.) Second, Plaintiffs allege that Hilda Esperanza (Hispanic, discussed within the Accountings and Finance Department) was initially hired during the class period to work in the

1998 U.S. Dist. LEXIS 14937, *

Water Department. (L. Moore Decl. P 4.) Third, while L. Moore was allegedly fired for excessive tardiness, she states that others, including Esperanza, were frequently tardy and/or absent, and that all of her (L. Moore's) tardies were excused by Krencjarz-Soria. (L. Moore Decl. PP 4-5.) Fourth, Davis, who allegedly was fired for budgetary reasons, states that she was informed by Graves's administrative assistant, Forte, that she was fired not because of her performance but because "that's politics" (Ptfs' 12(N) Stmt. P 159; G. Davis Decl. P 4); Defendants dispute this claim. (Dfts' 12(N) Resp. P 159; Dfts' Ex. 80 (Forte Aff.) P 36.)) Fifth, Defendants admit that Fisher's duties were assumed by two Caucasian Water Department employees, Blair and Davis, both [*48]

of whom had less seniority than did Fisher. (Dfts' 12(M) Stmt. P 105.)

### 5. Streets and Sanitation Department

Like Defendants, this court will consider the Streets and Sanitation Department as separate divisions; Plaintiffs allege that the department is not "rigidly" separated into divisions, but the court does not consider that issue to be material.

#### a. Supervisory

According to Harvey's personnel records, the following persons were employed as supervisory employees in the Street Departments prior to the Graves administration taking office:

| Employee | Position | Hiring Date | Race |
| --- | --- | --- | --- |
| Loria Cooper-Versher | Administrator | 10-07-91 | B |
| Charles Givines | Superintendent | 08-17-93 | B |
| James Harper | General Foreman | 11-21-83 | B |
| Victoria Jackson | Office Asst. | 09-19-94 | B |

(Ptfs' Ex. 4 (Harvey Empl. Rec.).) Prior to the Graves Administration taking office, there were 4 supervisory employees in the Streets Department, all African-American. Cooper-Versher resigned and Givines was terminated, both on April 17, 1995. (Ptfs' Ex. 4 (Harvey Empl. Rec.); Dfts' 12(M) Stmt. P 113.) One employee, Judy Seput (Caucasian) was hired as an Office Assistant on August 15, [*49] 1995. Thus, at the end of the class period, there were 3 supervisory employees in the Streets Department, 2 African-Americans (66.7%) and 1 Caucasian (33.3%). Givines' duties were assumed by Harper;

both Givines and Cooper-Versher were Johnson supporters, while Harper was a Graves supporter. (Dfts' 12(M) Stmt. P 113 (stating that Harper assumed Givines's duties); Johnson Decl. P 19 (stating that Cooper-Versher and Givines were active Johnson supporters); Tate Decl. P 4 (stating that Harper was a vocal Graves supporter).)

#### b. Street Division

According to Harvey's personnel records, the following persons were employed in the Street Division of the Streets Department prior to the Graves administration taking office:

| Employee | Position | Hiring Date | Race |
| --- | --- | --- | --- |
| Pedro Aguilar | Driver Sweeper | 01-25-85 | H |
| Henry Amos | Operator "A" | 11-09-87 | B |
| Bryan Boyd | Laborer | 08-24-87 | B |
| Robert Brown | Operator "A" | 01-31-88 | B |
| James Davis | Driver | 09-23-91 | B |
| Dolores Harris | Driver | 12-14-93 | B |
| Dexter Haynes | Operator "A" | 11-09-87 | B |
| Walter Jones | Laborer | 10-26-87 | B |
| Denise Kellogg | Inspector | 09-17-91 | B |
| Homer Land | Operator "A" | 03-24-69 | W |
| Donald Nesbit | Code Inf. Off. | 09-12-94 | B |
| Kenneth Perry | Laborer | 05-03-79 | W |
| Clifford Rainey | Operator "B" | 09-15-78 | B |